## THE CATANIA.

### (District Court, S. D. New York. March 11, 1901.)

SHIPPING—CARGO DAMAGES—UNSEAWORTHINESS—FROZEN WATER PIPES.

A water-service pipe on the upper deck of a steamship had a branch passing down through the deck, across the vessel, and terminating in a brass cap for the attachment of a hose for washing the midship deck. The space where the pipe terminated was not originally intended for cargo, but had been inclosed, and was sometimes used for that purpose. There was no valve by which such branch pipe could be cut off from the main pipe on the upper deck. While the ship was loading for a voyage in New York there was severe cold weather, during which the hatch into the compartment where the pipe terminated was opened, and the compartment was filled with cargo, and the hatch battened down, so that the compartment was not readily accessible. During the time of loading, the water in the branch pipe froze, and the cap burst, and in using the main pipe during the voyage water ran through the branch pipe into the compartment, and damaged the cargo, before it was discovered. *Held*, that as to such compartment the vessel was not seaworthy on sailing, nor was due diligence used to make her so, within the provisions of the Harter act or similar provisions in the bills of lading; that there was a lack of suitable care, also, in loading the cargo in the compartment with such a pipe not suitably protected against frost, and without inspection as to its condition, which could have been readily discovered and easily remedied, so as to prevent exemption of the owners from liability under other provisions of the bills of lading.

In Admiralty. Suit for damage to cargo.

Wing, Putnam & Burlingham, for libelant.

Convers & Kirlin, for claimant.

BROWN, District Judge. The above libel was filed to recover for water damage to three bales of leaf tobacco, part of a shipment on board the ship Catania on December 27, 1899, and injured on a voyage from New York to Key West.

The libel charges that the damage was due to the unseaworthiness of the vessel, in that a certain water pipe, which passed under the main deck, was so constructed that it could not be drained, in consequence of which the water froze and burst the pipe; and also due

to the negligence, fault and failure of the agents, master and owners of the steamship in the proper loading, stowage, custody and care of merchandise. The answer avers that the owners exercised due diligence to make the vessel seaworthy; that during the voyage she experienced heavy gales with high seas and heavy frosts, by reason of which the service pipe and the water therein froze, and that if any damage arose therefrom, it was from fault or error in the navigation or management of the vessel. The answer also alleges exceptions in the bill of lading for damages arising "from unseaworthiness existing before. at the time, or after shipment or sailing on the voyage, provided the owners have exercised due diligence to make the vessel seaworthy, * * * or by ice, leakage, breakage, changes in weather, heat, frost, wet."

The pipe in question was a branch from a fore and aft water pipe running forward from the engine room upon the upper deck on the starboard side to a little forward of the bridge, and thence running down through the upper deck and thence carried athwartship along the deck beam to near the port side, where it ended with a brass cap, by removing which a connection with the service hose for washing the midship deck was afforded. It was the brass cap that had burst. The pipe on the upper deck had valve connections for service there. The last use of the pipe was from two to three weeks before this accident, and a few days before the arrival of the ship in New York. For a number of days while in New York, the weather was very cold, being only from 8 to 10 degrees above zero, and the vessel sailed from New York on January 1st. The captain testified that on the 2d, it was still colder, being about zero. On January 3d, the weather was warmer, and on turning on the water for the purpose of washing the upper deck, it was soon discovered that there was a leak below, and examination disclosed that the brass cap had been forced off, letting the water down upon the cargo. The upper deck leaned or sheered aft, so that any water in so much of the pipe as was above the deck, would run aft when the pump was stopped, and freezing on the deck was thereby avoided. There was no valve at the point where the pipe went down below the deck, so that whatever water was in the pipe below deck, would remain standing and liable to freeze and burst the pipe whenever the weather was cold enough to do so.

The between-decks of this vessel was originally the main deck, with open spaces between the forecastle and poop. During the Spanish war, these spaces were inclosed and decked over for the transportation of troops and cavalry, and when the vessel resumed the transportation of freight, the spaces in question were occasionally used for cargo. On her present voyage, that compartment, after being loaded with cargo, was closed with hatches and tarpaulins and wedged down as customary.

It is suggested that the freezing of the pipe in the present case probably took place after the vessel sailed from New York, as the protest introduced by the libelant shows that the weather was colder on the second day out than during the time the vessel lay in port. It seems to me, however, much more probable that the pipe was

frozen while in port. She was here for a number of days when the weather was so severe as naturally to cause freezing at that time. The hatch must have been open for a considerable period, and the cargo that was loaded must have been cold; and if the water standing in the pipe was not frozen during this exposure, it seems to me very improbable that it would have been frozen afterwards when the hatches had been closed and battened down.

The evidence further shows that cargo spaces designed to be closed up so as to prevent ready access and constant inspection, ought not to have pipes with standing water in this port in winter weather. It is evident from the testimony that no freight vessels are ordinarily so constructed. From Mr. Mancor's testimony, the expert called by the respondent, it is clear that such pipes with standing water are dangerous in such cargo compartments. He says:

"My remedy in the case of that sort would be that when I was carrying fruits or animals I would put the pipe there and use it for the purpose for which it was intended, and when I was carrying cargo, I would take the pipe out of that altogether, * * * do it in 10 minutes; disconnect the thing entirely."

Mr. Martin, called by the libelant, states that a sufficient protection would be to put a valve on the upper deck at the point where the branch descends to prevent any water going below from the pipe on the deck above when water was not required below; and to remove the cap in the between-decks to allow any standing water in that branch to drain off. Had there been any such valve, it would have been but the work of a moment to drain off any standing water in the compartment in question by removing the cap and then closing the valve to prevent any further access of water during the voyage.

This case is almost identical in its circumstances with that of Morris v. Steamship Co., decided by Mr. Justice Mathew in July, 1900 (Q. B. Div. Commercial Court). There the vessel while in the port of New York in February, had a water service pipe in the between-decks of compartment No. 2 which was frozen and burst during severe cold, and on thawing caused water damage by the leak. The vessel was held liable for lack of thorough inspection to make sure that the pipe was sound before sailing, and because her condition with a frozen and burst pipe was unseaworthy. In that case, as in the present, the compartment where the burst occurred was not originally designed for cargo. In this decision Mr. Justice Mathew says:

"It would have been very easy to have found out whether or not the pipes had burst; a severe frost was likely to be followed by the usual consequences. The frozen water would expand the pipe, and it would not be detected that the pipe was leaking until there was a thaw. There would have been no difficulty in thawing the pipes, and if that course had been taken there would have been no difficulty in cutting off the water from the frozen pipes; * * * that she was unseaworthy when she sailed there cannot be any question. These two pipes were in such a condition that damage to the cargo would be inevitable; that there would be an accident was certain in the course of the voyage. She was unseaworthy therefore.

"Now, was due diligence used to secure that she should be seaworthy? I come to the conclusion as a matter of fact that due diligence was not used. From the effect the frost had upon the pipes it was manifest what would follow from that; it was equally clear to a reasonable mind, therefore, that

proper precautions should have been taken to ascertain whether or not the pipes were in a condition that was consistent with the safety of the cargo loaded in this compartment. On the question of fact then my view is in favor of the plaintiffs."

I entirely agree with the decision and the reasoning in the case cited, and find:

(1) That when the vessel sailed from New York, she was not in a seaworthy condition, as respects this compartment. (2) That due diligence was not used to make her seaworthy either by removing the pipe or by inserting a valve to prevent access of water below deck, or inspecting the pipe before sailing to see that it was sound. (3) That it was lack of suitable care in the loading of the tobacco to put it in a compartment with such a pipe, not suitably protected against frost and without inspection as to the condition of the pipe. The Manitoba (D. C.) 104 Fed. 145. (4) That under such circumstances neither the exemptions of the Harter act nor those of the bill of lading absolve the ship from responsibility.

Decree for libelant, with costs.