SPENCER KELLOGG & SONS, Inc., v. GREAT LAKES TRANSIT CORPORATION.

No. 15255.

District Court, E. D. Michigan, S. D.

April 18, 1940.

522

Hill, Hamblen, Essery & Lewis, by Carl V. Essery, and Sparkman D. Foster, all of Detroit, Mich., for libelant.

Sanders, Hamilton, Dobmeier, Connelly & McMahon, by W. M. Connelly, all of Buffalo, N. Y., for respondent.

TUTTLE, District Judge.

This is a libel for cargo damage brought by Spencer Kellogg & Sons, Inc., against Great Lakes Transit Corporation, the owner and operator of the steamer Fred W. Sargent.

On December 4, 1936, the Sargent loaded a full cargo of 174,500 bushels of wheat, the property of libelant, at the Kellogg B elevator, Superior, Wisconsin, for transportation from the port of Duluth-Superior to Buffalo, New York, where the wheat was to be held in storage aboard the Sargent until on or about April 15, 1937. She departed from Duluth on December 5th at 1:10 A. M. (Central Standard Time). During the morning of December 6th, while proceeding down Lake Superior in the vicinity of Manitou, it was discovered that the contents of the tank which supplied water to the crew for washing and sanitary purposes had drained into the cargo, in the between decks cargo space, through a break in a tee in the water line which served the 'midships deck house.

The libel charges that the break in the tee was caused by freezing; that in respect to the water lines, the tee and the cargo holds, the Sargent "was unseaworthy and unfit to receive said cargo and for the intended voyage;" and that the respondent "failed before and at the beginning of the voyage to exercise due diligence to make said steamer Fred W. Sargent in all respects seaworthy and properly equipped and supplied and to make the cargo holds fit and safe for the reception, carriage, and preservation of said cargo; and that said respondent and its agents and servants and said vessel failed to properly and carefully load, handle, stow, carry, keep, and care for said cargo; and that because of such unseaworthiness, lack of due diligence by respondent, and negligence of the vessel and her crew, said cargo became wet and damaged and was not delivered * * * in good order and condition as by the bills of lading was stipulated."

In its answer, respondent admits that the tee broke as the result of freezing and that it was through this break that the contents of the tank drained into the cargo. Respondent admitted on the record that the cargo was received aboard in sound condition and was delivered in a damaged condition.

In defense, the answer pleads the Carriage of Goods By Sea Act 1936 (46 U.S. C.A. Chap. 28, § 1300 et seq.), which was incorporated by reference in the bills of lading, and particularly the following provisions of the Act (46 U.S.C.A. § 1304):

"(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship; * * *

"(c) Perils, dangers, and accidents of the sea or other navigable waters;

"(d) Act of God."

The answer alleges:

"* * * that due diligence was exercised to make the said vessel seaworthy and properly manned and equipped and supplied before and at the beginning of the voyage.

"Upon information and belief that any damage sustained by the goods of the cargo, while under the supervision of the operator or of the respondent, was not caused or contributed to by any fault or neglect on the part of the respondent or on the part of the vessel, but was the result of causes exempted in the Bill of Lading and the Act of Congress referred to therein.

"If any of the said damage was the result of negligence on the part of the officers, agents or crew of respondent, or of the vessel, such negligence consisted in the faults or errors of navigation, or in the management of the ship, for which the respondent or the owners of said vessel are excused from liability.

"Respondent further alleges that the sanitary line in question was in accordance with established lake practice. Upon information and belief that the line was in use and in place on the steamer since the time of the construction of the said steamer, and that at all times it gave satisfactory service; and with respect to said water line and its use, and in all respects, the Steamer

Fred W. Sargent was seaworthy and fit for the service undertook with respect to the cargo. That the freezing of said line occurred without fault on the part of the carrier; or to conditions for which the carrier·is exempt and for which the respondent claims exemption herein."

The defense developed in the trial is in substance that respondent exercised due diligence to furnish a seaworthy vessel, that after the vessel departed from Duluth and while she was proceeding down Lake Superior the tee froze as a result of neglect on the part of the first mate to have the main sanitary water line shut off in the engine room and drained, and that this neglect was a neglect or fault "in the navigation or in the management of the ship" for which respondent is exempt from liability under the terms of the statute. Respondent rests this defense on the theory that it was after the vessel departed on the voyage and while she was proceeding down Lake Superior that the tee froze.

### Findings of Fact

The Sargent is a steel vessel 350 feet long, 46 feet in beam and 30 feet in molded depth. She was built in 1905 for the package freight trade and is operated in that trade and in the carriage of bulk grain cargoes.

The lower hold is divided by bulkheads into five compartments. The upper hold, or that part between the main deck and the weather deck, is generally referred to as the between deck space. It is one compartment, extending from the forward collision bulkhead to the machinery space bulkhead, and is about 260 feet long and 46 feet wide. When operated as a package freighter, cargo is handled through side gangways in the between deck space. When operated as a bulk carrier of grain, the side gangways are sealed and the grain is loaded and unloaded through hatches on the weather deck. She has ten hatches each about 9 feet wide and a little less than the beam of the ship in length.

The 'midships ° deckhouse, which has largely been done away with on the Great Lakes, except on package freighters, is located on the Sargent on the weather deck between Nos. 7 and 8 hatches. This deckhouse contains two rooms. The one on the port side is occupied by four deckhands and the one on the starboard side by six firemen. Each of these rooms has one wash bowl supplied with cold water only. Nei-

ther room is furnished with facilities for heating water and neither has a bath or a toilet.

The tank which supplies water for washing and sanitary purposes is made of steel and is located on top of the after cabin in an exposed position. It holds about 3,000 gallons and to prevent the water from freezing the tank contains two 4-inch brass coils about 9 feet long which are heated with steam from the radiator line in the after cabin. These coils are not designed to furnish hot water but simply to keep the water from freezing in the tank.

On leaving port, the tank is filled as soon as the vessel is out in the lake and it is always filled just before entering port. It is filled by means of a hose. When the watchman wishes to fill the tank, he requests the engineer to start the pump used for that purpose. The duty of seeing that the tank is kept filled rests on the watchman. Ordinarily, a tankful lasts four or five days.

The water is fed by gravity from the tank to a pump in the lower engine room and passes through this pump into the main sanitary water line. The pump maintains a pressure of thirty pounds on the line. In event of an unusual drain on the line, such as a steady leak or a faucet that has been left open, the pump runs oftener than usual in order to maintain the pressure.

The main sanitary water line is a black iron pipe $1\frac{1}{4}$ inches in diameter. It leads from the pump to the upper engine room where it passes through the machinery space bulkhead, on the port side, into the between decks cargo space and runs forward through that space as far as the forward cabin where it rises through the deck into the forward cabin. In the forward and the after cabins branch lines contained wholly within those cabins run from the main line to the various rooms. There are upwards of 26 outlets in all.

In the between deck cargo space the main sanitary water line is carried alongside the auxiliary steam line, which supplies steam to the forward winches, and the return or exhaust steam line, on hangers extending about sixteen inches below the under side of the weather deck. The auxiliary steam line is about $2\frac{1}{2}$ inches in diameter and carries a pressure of about 120 pounds. The exhaust steam line is about 3 inches in diameter and carries a pressure of 10 to 15 pounds. Both steam lines are covered with one inch magnesia·

except at the eight flanges of the expansion joints and at the hangers. The steam lines run the length of the between deck space, or about 260 feet, and there is a hanger every six feet. At the hangers and at the flanges the steam pipes are bare.

The branch water line that serves the deck house is a ¾ inch pipe. It taps the main sanitary water line at a point abreast the deckhouse and runs inboard at a right angle to the main line for a distance of 45 inches where it is connected by a tee to the deckhouse riser. It was this tee that froze. Between intervals of drawing water in one of the deckhouse wash bowls this line is a dead end line at the tee. The ¾ inch line and the tee are without protection of any kind against freezing. The line and the tee are suspended about 16 inches below the under side of the weather deck between Nos. 7 and 8 hatches, and when these hatches are open this line and the tee are exposed to all intents to the outside temperature.

The layout of the sanitary water system is such that the freezing of the tee in the branch line to the deckhouse did not affect the use of the main line nor interfere with the passage of water through the main line to the forward cabin.

The ¾ inch line to the deckhouse is not provided with a shut-off valve of its own. The only means provided for shutting off the ¾ inch line is to close the shut-off valve on the main line in the engine room. When this is done, the forward cabin, occupied by the master, the mates and the deck crew, except for the deckhands, is also deprived of water.

The Sargent arrived in Duluth on her upbound voyage on December 2d at 9:00 P. M. (Central Time). When she arrived, the weather was mild, 30 degrees above zero, and it continued mild during most of the time that she was discharging her upbound cargo. Until 11 A. M. December 3d, the lowest reading was 26 degrees above zero and although the temperature began to drop around noon of the third, it was not until the evening of the third that severe temperatures set in.

During the night of December 3d, the temperature declined rapidly and at 9 A. M. on December 4th, when the loading of libelant's cargo began, the temperature was but 1 degree above zero. It held at 1 degree and 2 degrees above until about 4 o'clock in the afternoon when it dropped to six degrees below zero and from then until after 11 o'clock that night the hourly readings ranged between five degrees below and 7 degrees below zero. Loading was completed about 10:15 P. M. (Central Time) on December 4th. During the thirteen hours that loading was in progress, at all times there were several hatches open and part of the time all of the hatches were open. In other words, throughout the thirteen hours that loading was in progress the between decks cargo space was exposed to zero and sub-zero temperatures, and in the period of sub-zero temperatures that prevailed from about 4 P. M. to 11 P. M. the ¾ inch line and tee were exposed almost directly to those temperatures, as No. 8 hatch, between which and No. 7 hatch the ¾ inch line and tee were suspended, was one of the last two hatches filled.

When trimming the cargo was completed, the hatches were full, but along the steam lines about 2½ feet of air space was left between the top of the cargo and the steam lines or about 3½ feet between the top of the cargo and the under side of the weather deck. In between the hatches the amount of air space varied. Under the ¾ inch water line to the deck house between Nos. 7 and 8 hatches there was about 3 feet; in between some of the hatches the top of the cargo was almost up to the weather deck.

In battening the hatches the wood hatch leaves, which were 2½ inches thick, were covered with tar paper, laid next to the leaves, and two tarpaulins laid over the paper.

The officers of the Sargent admitted that in zero weather it would be warmer in the between decks when the hatches are closed than it would be when the hatches are open just as a house would be warmer with the doors and windows closed. Every witness questioned on the point, except a grain chemist who testified for respondent, said that after the hatches were battened the warmth in the grain and the heat in the two steam lines that run the length of the between decks would warm up the air space above the top of the cargo, the air space in which the ¾ inch water line and tee were located. The grain chemist thought that the air space would become colder after the hatches were closed, a conclusion that is contrary to science and to experience as shown by the testimony of Professor Hugh E. Keeler, professor of thermodynamics, steam power engineering and air-conditioning in the School of Engineering at the University of Michigan, Wil-

liam F. Smith, United States Inspector of Boilers and Machinery at Buffalo, a witness for respondent, the marine surveyors, and the officers of the Sargent.

William F. Smith, who was employed as a surveyor in the testing of storage cargoes of grain at Buffalo before entering the Government service, said that the temperature of grain cargoes (sound grain) generally runs from 65 degrees to 70 degrees. Ed. N. Smith, a witness for libelant and a surveyor of long experience, testified that he had never, with one exception, seen sound grain with a temperature of less than 48 degrees. The temperature of the grain in the Sargent's cargo was not taken while being loaded and the elevator at which it was loaded does not take the temperatures in the bins, but it was agreed on the record that the grain would have a temperature at least of 50 degrees.

It was Professor Keeler's opinion that after the hatches were closed it would not take very long for the warmth in this mass of almost 175,000 bushels of wheat to begin to affect the temperature of the air space above it. His opinion finds support in the testimony of respondent's witnesses, Smith, the United States boiler inspector, respondent's surveyors, and the officers of the ship, all of whom said that the warmth in the grain would tend to warm the air above it.

An even more important factor to be considered is the heat from the two steam lines, one carrying about 120 pounds and the other 10 to 15 pounds steam pressure. At the hangers, or every six feet, and at the flanges of the expansion joints both steam lines were bare. In addition, there would be some leakage of heat through the magnesia covering. While the hatches were open the heat from the steam lines was dissipated through the open hatches but after the hatches were battened the heat from the steam lines was confined to the air space above the cargo. It takes a very small amount of heat to raise a very large volume of air through an appreciable temperature range and it is Professor Keeler's opinion that after the hatches were closed the steam lines made a distinct heat contribution to the air space. Again, Professor Keeler's opinion finds support in the testimony of respondent's own witnesses. The boiler inspector, respondent's surveyors and the officers of the Sargent testified that after the hatches were closed the heat from the steam lines would warm up the air

space. The chief engineer of the Sargent admitted that in their effect on the air space the steam lines served as radiators after the hatches were battened.

As soon as the hatches were secured for sea, the Sargent departed on her voyage to Buffalo. She cleared Duluth at 1:10 A. M. (Central Time) December 5th. Between the time she completed loading and her departure for Buffalo, about three hours later, the wind had changed from west to southeast and the temperature had risen from 7 degrees below zero to 1 degree above zero. During the 5th, the wind continued southeast with rising temperatures and by 3 P. M. on the 5th the temperature at Duluth had risen to 19 degrees above zero.

When the Sargent was clear of the harbor, the water tank was filled as usual. The following morning, December 6th, about nine or ten o'clock, the watchman requested the engineer to start the pump used to fill the tank, stating that the tank was almost empty. The chief engineer testified that he was in the engine room at the time, that the pump was started, and that the watchman filled the tank again. The chief engineer also testified that the use of so much water in so short a time caused him to look at the pump on the sanitary line, that he observed it was running steadily, which indicated to him the possibility that an outlet on the line had been left open. The assistant engineer on watch denied that the pump was started as requested by the watchman, but he agreed with his chief that the latter proceeded to inspect the various outlets to ascertain the cause of using so much water.

No outlets were found open and after making his inspection, the chief engineer reported the situation to the master who directed the first mate to make an inspection in the between decks, which was done. A scuttle hatch was opened and on entering the between decks the mate found that water was running into the grain through a break in the tee in the ¾ inch line to the deckhouse. It is admitted that the break was a frost break. The main line was then shut off in the engine room while the ¾ inch line to the deckhouse was being disconnected and plugged. How long the water had been running into the cargo and how much ran in is not known and cannot be determined definitely, but calculations made by the assistant engineer based on attaching the broken tee to a faucet on a city water line carrying fifty pounds pres-

sure indicate that the tee had been leaking at least six hours and that one tankful, and possibly more, had drained into the cargo before the broken tee was discovered.

It is respondent's theory that the tee had not as yet frozen when the Sargent departed from Duluth; that it both froze and thawed out some time during December 5th and the early morning of the 6th, while the vessel was proceeding down Lake Superior. Respondent predicates this theory on testimony by the ship's officers that the weather was more severe after leaving Duluth than it had been while loading the cargo; testimony by two firemen, which respondent asserts establishes that the men in the deckhouse were not without water while in port and therefore that the tee did not freeze until after the vessel departed on the voyage; and testimony by the first mate that he washed his hands in the deckhands' room about 6:30 and again about 9:30 on the evening of December 4th while the vessel was loading her cargo.

I am not unmindful of the weight that is usually given to testimony from experienced mariners as to weather conditions encountered by them at sea. But there are also tests long used by courts of admiralty in weighing testimony which I must take into account in weighing the testimony of the crew as to weather conditions as well as the testimony of the two firemen and of the mate on the other points mentioned. Whether the cause is sense of loyalty to the ship, or bias in favor of the ship, or the result of discipline, it is well known that the master and crew of a vessel are always reluctant to admit responsibility for a loss. They are brave men; they are not afraid of the elements, but they are afraid of their employer; and their fear or loyalty or bias, or whatever name it may be known by, unfortunately follows them into the court room and is often more controlling than their oath. Every admiralty judge knows that this condition exists and it is a condition that I must take into account.

Another is the fact that the circumstances leading to the damage sustained by the grain are solely within the control of respondent so far as what went on aboard the ship is concerned. The loss is not even entered in the ship's log. The first record in writing was the marine protest executed by the master ten days after the loss occurred and five days after the Sargent arrived in Buffalo. Testimony given under such circumstances "requires close scrutiny and is not necessarily to be accepted unless found to be inherently worthy of belief."

There are no thermometer readings entered in the log and it is admitted that no thermometer readings were taken on board the Sargent either in port or on the voyage. The testimony of her officers that it was colder on Lake Superior on December 5th than it had been while loading on December 4th was based solely on feeling. It was mere guesswork. The master testified at first that the most severe weather experienced was while the vessel was loading. Later, when recalled, he thought it was colder out on the lake than it had been in port. The mate estimated that it was 12 degrees below zero on the 5th but he also estimated that on the morning of the 6th, at which time the tee had thawed and the contents of the tank had run into the cargo, it was ten degrees below zero. Their testimony is unimpressive and contrary to all the reasonable probabilities as shown by the official weather records and the entries in the Sargent's log in reference to the direction of the wind on December 5th and the early morning of the 6th.

Earlier I have commented that in the three hours that elapsed between completing the loading of the cargo and the Sargent's departure from Duluth, during which she was securing the hatches for sea, the wind had shifted to southeast and the temperature had risen 8 degrees. She left Duluth with the temperature rising and the official weather records at the Duluth, the Houghton, the Marquette and the Sault Ste. Marie stations show that the prevailing wind along the south shore of Lake Superior as the Sargent made her way down the lake was from the southeast accompanied by rising temperatures. No ice was encountered in the lake and it is significant that the entries in the Sargent's log as to wind conditions show that from the time she left Duluth until the early morning of December 6th the direction of the wind along her course was from the southeast, that is, from a direction in which the temperature was rising. The Sargent was not proceeding in an area of falling temperatures on December 5th and the morning of December 6th, but in an area of rising temperatures, and I so find.

The testimony of the two firemen was taken by deposition at Buffalo a few days before the trial began. They were called to testify on a point that goes to the very

heart of respondent's theory of the case and they were the only witnesses from the crew whose testimony was not taken in open court. They live in Buffalo, they were not working when their testimony was taken, and the record does not disclose any reason why they could not have been produced for examination in open court instead of giving their testimony by deposition. The lack of accuracy of observation on the part of the two firemen is indicated by the fact that both of them thought that the tank which supplied water to the deckhouse was located on top of the deckhouse instead of on top of the after cabin. Neither of them reported that the deckhouse was out of water and it is evident from their testimony that they did not pay much attention to whether there was or was not water available in the deckhouse. The weather was cold, the water in the deckhouse was cold, and they had hot water in which to wash in the fire hold. The only thing that was impressed upon their minds was that some time about a day after the ship left port the word was going around the ship that the tank was empty. Their testimony is not at all persuasive on the point for which it is urged by respondent.

As further proof that the tee was not frozen when the Sargent left Duluth, respondent also points to the testimony by the first mate that he washed his hands in the deckhands' room about 6:30 P. M. on the 4th on his way to supper and again about 9:30 P. M. on his way to the galley to have an evening lunch. The first officer of a steamship does not wash his hands in the deckhands' room. The appearance of this witness and his bearing in giving this testimony impressed me very unfavorably. This testimony is unworthy of belief.

But assuming that the water was running in the deckhouse at the times the first mate said it was, all that his testimony establishes is that at 9:30 P. M. the tee had not as yet frozen. It does not establish that at the time loading was completed and the hatches were closed the tee had not as yet frozen. The ship's routine was run on Eastern Time. It was about 9:30 P. M. when the mate claims he washed in the deckhands' room the second time and it was not until 11:15 P. M. ship's time, or almost two hours later, that loading was completed. Between 9:30 and 11:15 P. M. the temperature was 6 degrees and 7 degrees below zero. The evidence points directly to the conclusion that No. 8 hatch alongside the tee was still open, as it was in Nos. 8 and 9 hatches that the last of the cargo was loaded, and that for substantially two hours after 9:30 P. M. the tee was exposed to the effect of the sub-zero temperatures. No examination was made of the 3/4 inch line to the deckhouse when the hatches were closed; no investigation of any kind was made to determine whether this line had frozen. For aught that her officers knew, the Sargent had a frozen water line in her cargo hold when she completed loading her cargo and the hatches were closed and battened.

A list of the cargoes carried and the voyages made by the Sargent prior to this occasion is in evidence. In support of its theory, respondent points to this list and to testimony by the officers that this was the first time that the water line had frozen on the Sargent, and that other ships in the fleet have the same installation and that the witnesses had never heard of a water line in a cargo hold freezing on the other ships. This line of testimony is also subject, in determining its weight, to the tests I have mentioned. No evidence was offered as to the weather conditions that existed on prior voyages, either of the Sargent or of the ships having the same installation, and for all that the record shows precautions to prevent the line from freezing may have been taken on prior voyages. On the voyage in question, the record shows definitely that no precautions were taken and that the line froze.

■ When analyzed, respondent's theory stated in its true perspective is that during the thirteen hours that the hatches were open and the cargo hold was exposed to zero and sub-zero temperatures the tee would not freeze, but that after the hatches were closed and covered with tar paper and two tarpaulins and the warmth in the grain and the heat from the two steam lines was warming the air space above the top of the cargo and the ship was proceeding in an area of rising temperatures the tee would freeze and under the same conditions that existed when it froze would then thaw. The theory is untenable on its face and is contrary to experience and to every rule of science. It is contradicted by respondent's own witnesses; the officers of the ship and respondent's surveyors testified without exception that the cargo hold would be warmer after the hatches were closed than it would

be while the hatches were open. Common-sense tells one that this would be so and that the tee froze while the Sargent was loading her cargo. The evidence and all the probabilities require that conclusion. I find that the tee froze while the cargo was being loaded and that the Sargent departed on her voyage with a frozen water line in the cargo hold.

Respondent's showing on the issue of due diligence is no more satisfactory than is its explanation of the loss. It knew when it engaged to carry this cargo that the grain would be loaded after the first of December and that in December severe temperatures are to be expected at Superior and Duluth and on Lake Superior generally. It knew that in loading the grain it would be necessary to have the hatches open, that the ¾ inch line to the deckhouse was a dead end line when not being used, that the line was suspended between two hatches, that it was not protected in any way against freezing, that it did not have a shut-off valve where it tapped the main line, and that it could not be shut off except by shutting off the main line in the engine room and depriving the entire forward crew of water in their quarters.

■ What diligence was exercised in respect to the water line? The president of the company, as appears from his testimony did not address his attention to that subject. He relied on the master and the officers of the ship. The master said that it never occurred to him to do anything. The mate said he gave no thought to the possibility of the water line freezing. The chief engineer testified that in zero weather with the hatches open he would expect the line to freeze, and that reliance was placed on the deckhands and firemen using the two wash bowls in the deckhouse often enough to keep the line from freezing. The firemen had hot water in the firehold in which to wash. A bath and facilities for obtaining hot water were provided in the forward cabin for the deck crew. The only diligence that was exercised was to rely on men who were engaged in the performance of dirty work washing in cold water in the deckhouse in zero weather when hot water was provided for them in other parts of the ship. That does not constitute the exercise of due diligence. The record is clear that both before and at the beginning of the voyage there was a complete lack of

diligence to render the Sargent seaworthy as to the sanitary water line.

### Conclusions

■ It is admitted on the record that the cargo was received in good condition, delivered in damaged condition, and that the burden of explaining the loss rests upon respondent. This is the rule under the Harter Act, 46 U.S.C.A. §§ 190-195. The Vallescura, 293 U.S. 296, 303, 304, 55 S.Ct. 194, 79 L.Ed. 373. This is also the rule applied under the British Carriage of Goods by Sea Act. Gosse, Millerd, Ltd. v. Canadian Government Merchant Marine, Ltd., 32 Ll.L. 91, 95 (House of Lords), construed the British Act, which like ours is derived from the Hague Rules and, as to the provisions that were under construction, corresponds with our Act.

Respondent as a carrier is bound under the terms of our 1936 Act (46 U.S.C.A. § 1303(1).

"* * * before and at the beginning of the voyage, to exercise due diligence to—

"(a) Make the ship seaworthy;

"(b) Properly man, equip, and supply the ship;

"(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation."

Under the terms of Sec. 1304(1), the carrier is not liable "for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy * * * and to make the holds, * * * and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title."

Under Sec. 1304(2) (a), the carrier is relieved from liability for losses resulting from "(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship."

Section 1304(1) provides that where the loss has resulted from unseaworthiness: "the burden of proving the exercise of due diligence shall be on the carrier * * *".

■ The words "due diligence" in Sec. 1303 and Sec. 1304(1), and the words "in

the navigation or in the management of the ship" in Sec. 1304(2) (a) are found in the Harter Act (46 U.S.C.A. §§ 190–195), and as used in that Act have a long judicial history in the United States. The words "in the navigation or in the management of the ship" have been held by the British courts to have the same meaning in the British Act as in our Harter Act. Gosse, Millerd, Ltd. v. Canadian Government Merchant Marine, Ltd., supra, p. 93. I hold that the Congress intended these words as used in the Carriage of Goods by Sea Act 1936, to have the same meaning as that assigned to them in the long line of decisions construing these words as used in the Harter Act.

■ It is settled law under the Harter Act that the obligation to exercise due diligence extends to the owner's employees. International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 225, 21 S.Ct. 591, 45 L.Ed. 830.

The same rule has been applied by the British courts in construing the British Carriage of Goods by Sea Act. W. Angliss & Co. Ltd. v. P. & O. Steam Nav. Co. 28 Ll.L. 202, 213–14 (Court of Kings Bench).

■ I hold that under our 1936 Act the obligation of the carrier to exercise due diligence is not limited to his personal diligence but includes the crew of the vessel and the exercise of due diligence by the crew in the use of the equipment of the vessel "before and at the beginning of the voyage."

■ In the Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 8, 43 L.Ed. 241, it was said, "The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport." A vessel may be seaworthy for the carriage of stone or coal but unseaworthy for the carriage of grain or other perishable cargoes. She may be seaworthy to carry perishable cargoes in the summer months, but unseaworthy to carry such cargoes in freezing weather. The nature of the cargo, the time of the year in which it is to be carried and the conditions reasonably to be expected at that time of year are factors which enter into the test of seaworthiness. The Jeanie, 9 Cir., 236 F. 463.

■ The Sargent was unseaworthy "before and at the beginning of the voyage" because she had a frozen water line in her cargo hold when the hatches were closed and battened. Respondent's own surveyors admit that a vessel which has a frozen water line in her cargo hold when the hatches are closed and made ready for the voyage would not be seaworthy for the transportation of a grain cargo. No honest witness could say otherwise. The Catania, D.C., 107 F. 152, 153–155.

■ The Sargent would also be unseaworthy as to the ¾ inch water line even though the freezing occurred after she left Duluth. She undertook to carry a cargo that is highly subject to damage by water. The cargo was loaded the first week in December at Superior, Wisconsin, for transportation from the port of Duluth-Superior to Buffalo. Respondent knew, and it is common knowledge, that zero and sub-zero temperatures are to be expected in December at Duluth and Superior and on Lake Superior generally. Respondent knew that when water was not being drawn in one of the wash bowls in the deck house the ¾ inch line was a dead end line, that the line was suspended under the weather deck between two hatches, that it was without protection of any kind against freezing, and that no provision had been made for shutting it off except at the expense of the entire forward crew. Reasonable prudence requires a vessel engaged in carrying perishable cargoes on Lake Superior in December, when zero and sub-zero temperatures are to be expected, to protect the water lines in the cargo hold against freezing; and when she has an unprotected ¾ inch water line in the cargo hold she is not seaworthy for the carriage of perishable cargoes in December.

■ Respondent urges that the Sargent has been operated with the same installation practically since she came out, or for upwards of thirty years, that there are other ships in the fleet having the same installation and therefore that the installation was in accordance with Great Lakes practice. Respondent also points to testimony by some of its witnesses that it is not the practice to insulate water lines in cargo holds on the Great Lakes. What the practice may be as to carriers of non-perishable cargoes, such as stone, coal and ore, is not relevant in determining the seaworthiness of the Sargent. And general practice is not necessarily the test by which seaworthiness is to be determined nor is an installation which may have been considered proper

when the Sargent came out upwards of thirty years ago necessarily the standard by which seaworthiness is to be measured to-day. It does appear from the testimony of one of respondent's surveyors that there is at least one company on the Great Lakes that has begun to insulate the water lines in the cargo holds of its ships. To say the least, a water line in the cargo hold of a ship carrying perishable goods is not desirable and if the ship is to be used in zero weather the carrier should be required as a minimum precaution to insulate the line against freezing. The T. J. Hooper and Tow, 2 Cir., 60 F.2d 737, 740.

Due diligence was not exercised by respondent to make the Sargent seaworthy before and at the beginning of the voyage and the cargo holds fit and safe for the reception, carriage and preservation of the grain. There can be no doubt that there was a complete failure to exercise any degree of diligence in respect to the ¾ inch water line. It is clear on the record in this case that respondent failed to exercise due diligence to render the vessel seaworthy for the reception, preservation and carriage of libelant's grain. Moreover, the exercise of the due diligence required by the statute extends to the carrier's servants and includes the crew of the vessel and their use of the equipment aboard the vessel. The evidence is all one way that none of the officers of the ship gave any thought to this water line. They knew the weather was severe; it was so cold while loading that in shifting the vessel back and forth under the elevator spout it was necessary to use the main engine to break the vessel free from the ice in the loading slip. But it never occurred to them to do anything about this water line. They relied, as testified by the chief engineer, on the men in the deck house using the wash bowl often enough to keep the water from freezing. That was not due diligence, but a complete lack of diligence.

Respondent, admitting that the officers of the ship were negligent, contends that their negligence was fault or neglect in the management of the ship for which it is exempt under the provisions of Section 1304(2) (a). The basis of this contention is that the main water line was provided with a shut off valve in the engine room and that the officers could have closed this valve and thereby have avoided the danger of the line freezing and the water entering the cargo.

Under the Harter Act, one of the tests used in determining whether an act constitutes negligence in the management of the ship is the purpose for which the act was done or was left undone. The Germanic, 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610. This is also the test which has been applied by the English courts in the interpretation of the British Carriage of Goods by Sea Act which, as said, is similar to our Act. Gosse, Millerd, Ltd. v. Canadian Government Merchant Marine, Ltd., supra, p. 95. The master of the Sargent testified that if they had shut off the water line to keep it from freezing, the purpose would have been to prevent the water from running into the cargo through the break. In view of this testimony, there is no doubt that the purpose in shutting off the line would have been the protection of the cargo and that the failure to shut off the line was not negligence in the management of the ship but negligence in the care and custody of the cargo. Then, again, the only means by which the ¾ inch line could be shut off was to close the valve on the main line in the engine room, which would have deprived of water not just the deck house but also the forward cabin, occupied by the master, the mates and other members of the forward crew. A water system so designed exacts more care by the ship's officers than can be required at the expense of cargo. The Elkton, 2 Cir., 49 F.2d 700, 701.

Under the Harter Act, where both unseaworthiness of the vessel and fault in the management of the ship are present, the carrier is liable for the loss, i. e., fault in the management of the ship does not operate under such circumstances to relieve the carrier from liability. The Elkton, supra; The Samaria, D.C., 21 F.2d 191, 1927 A.M.C. 1057. It is urged by respondent that the 1936 Act has abolished the warranty of seaworthiness and reduced the carrier's obligation to one to exercise due diligence to render the vessel seaworthy, and therefore, that decisions under the Harter Act are not applicable. Assuming, without deciding, that the 1936 Act has abolished the warranty of seaworthiness and has reduced the carrier's obligation to one to exercise due diligence to render the vessel seaworthy, the 1936 Act has not

532

reduced the standards by which the seaworthiness of a vessel is to be tested, nor the requirements that constitute the exercise of due diligence.

 I hold that under the 1936 Act, where unseaworthiness of the vessel, caused by the failure of the carrier to exercise due diligence, and negligence in the management of the ship concur in causing the loss, the carrier is liable for the loss. The Sargent was unseaworthy as to the ¾ inch water line in the cargo hold and the carrier and the crew failed to exercise due diligence to make her seaworthy before and at the beginning of the voyage. Under these conditions, even though the failure to shut off the main water line in the engine room was negligence in the management of the ship, which I have found it was not, respondent would still be liable, inasmuch as unseaworthiness resulting from the failure of the carrier to exercise due diligence and negligence in the management of the ship concurred in causing the loss.

 In reaching these conclusions, I am mindful that a court hears the facts of a case in the way of history, and that it is always easier to look back and say what should have been done than it is to look ahead. But the judgment as to what should have been done is not co-extensive with the carrier and its crew. What should have been done is to be determined in the light of what a prudent carrier and prudent officers of a ship should have apprehended under the conditions that existed. Common prudence indicated that the ¾ inch water line should have been protected from freezing and that provision should have been made for shutting it off from the main source of supply without depriving the entire forward crew of water. From the standpoint of what a prudent carrier and prudent officers of a ship should have apprehended, there was a complete lack of exercise of diligence by the carrier and its employees to make the Sargent seaworthy for the reception, carriage and preservation of libelant's grain. The Sargent was not seaworthy; respondent and its servants failed to exercise due diligence to make the vessel seaworthy; and the unseaworthiness was the cause of the loss. I hold respondent liable for the damages sustained by libelant with interest and costs to be taxed; with a reference to Donald L. Quaife, as Special Master, to determine the amount of the damages, unless the parties can agree on the amount.