ZANDER & COMPANY, Inc., J. A. Folger & Company et al.

v.

MISSISSIPPI SHIPPING COMPANY, Inc. and THE S.S. DEL SUD, Her Engines, Boilers, Etc.

J. ARON & COMPANY, Inc.

v.

MISSISSIPPI SHIPPING COMPANY, Inc., and the S.S. Del Sud, Her Engines and Appurtenances.

Nos. 2413, 2483.

United States District Court E. D. Louisiana, New Orleans Division.

Jan. 16, 1959.

Montgomery, Barnett, Brown, Sessions & Read, Henry J. Read, New Orleans, La., for libelant Zander & Co., Inc., and others.

Deutsch, Kerrigan & Stiles, Malcolm W. Monroe and Joaquin Campoy, New Orleans, La., for libelant J. Aron & Co., Inc.

Terriberry, Young, Rault & Carroll, Walter Carroll and Alfred M. Farrell, Jr., New Orleans, La., for respondent.

CHRISTENBERRY, Chief Judge.

The foregoing matters having been consolidated for trial, and having been

tried to the Court without a jury, the Court having heard evidence and the arguments of proctors, and having taken time to consider the matters, hereby makes the following findings of fact and conclusions of law:

## Findings of Fact

### I.

Respondent, Mississippi Shipping Company, Inc., was and still is a corporation duly organized under the laws of the State of Louisiana, owning and operating a number of vessels engaged in the carriage of cargo on the high seas, having an office and place of business in the Hibernia Bank Building, in the City of New Orleans, State of Louisiana. Respondent is the owner of the S.S. Del Sud, operating the said vessel in the common carriage of merchandise for hire between, among others, the ports of Buenos Aires, Montevideo, Santos, Rio de Janeiro, Curacao, and New Orleans. The Del Sud is a large ocean liner with over 90 passenger accommodations and six cargo holds, with a length of 494 feet 7 7/16 inches, breadth of 69 feet, gross tonnage of 10,073, and net tonnage of 5,543.

### II.

Each of the libellants has the legal status ascribed to them in the libels and has the interest in the various shipments ascribed to them in the libels. Each of the shipments referred to in the libels was carried by the respondent pursuant to the terms of its regular bill of lading issued by its authorized agents, incorporating the provisions of the U. S. Carriage of Goods by Sea Act, 1936, 46 U.S.C.A. § 1300 et seq. Each of the said shipments was delivered to the respondent at the port of loading in good order and condition and each of the said shipments sustained sea water damage sometime during the voyage from Santos to New Orleans.

### III.

a) Voyage 36 of the Del Sud began when she departed the port of New Orleans on August 11, 1952. The chronological order of the voyage, and the date and time of arrival at and departure from each port of call, was as follows:

### Voyage 36 Southbound

| | | | |
|---|---|---|---|
| New Orleans | Departure | 3:04 P.M. | August 14, 1952 |
| St. Thomas, Virgin Is. | Arrival | 2:51 P.M. | August 18, 1952 |
| St. Thomas | Departure | 7:05 P.M. | August 18, 1952 |
| Rio de Janeiro | Arrival | 1:50 P.M. | August 27, 1952 |
| Rio de Janeiro | Departure | 4:59 P.M. | August 28, 1952 |
| Santos | Arrival | 7:19 A.M. | August 29, 1952 |
| Santos | Departure | 3:55 P.M. | August 30, 1952 |
| Montevideo | Arrival | 8:57 P.M. | September 1, 1952 |
| Montevideo | Departure | 8:06 P.M. | September 2, 1952 |
| Buenos Aires | Arrival | 7:52 A.M. | September 3, 1952 |

### Voyage 36 Northbound

| | | | |
|---|---|---|---|
| Buenos Aires | Departure | 3:15 P.M. | September 6, 1952 |
| Santos | Arrival | 7:44 A.M. | September 9, 1952 |
| Santos | Departure | 10:14 P.M. | September 10, 1952 |
| Rio de Janeiro | Arrival | 12:00 Noon | September 11, 1952 |
| Rio de Janeiro | Departure | 11:04 P.M. | September 11, 1952 |
| Curacao, B. W. I. | Arrival | 10:30 A.M. | September 20, 1952 |
| Curacao, B. W. I. | Departure | 12:31 A.M. | September 21, 1952 |
| New Orleans | Arrival | 8:00 A.M. | September 25, 1952 |

b) The amount of cargo loaded and discharged at each port and the change in draft resulting therefrom on Voyage 36 was as follows:

| Port | Tons Cargo | Draft | | |
|------|-----------|-------|---|---|
| New Orleans | Loaded 1350 | 18′ 0″F. | 22′ 0″A. | 20′02″M. |
| St. Thomas | None<br>(1795 bbls. fuel) | Arr. 17′04″F.<br>Dep. 17′08″F. | 21′06″A.<br>21′08″A. | 18′05″M.<br>18′08″M. |
| Rio de Janeiro | Loaded 166<br>Discharged 109 | Arr. 16′06″F.<br>Dep. 16′02″F. | 21′00″A.<br>21′06″A. | 18′09″M.<br>18′10″M. |
| Santos | Loaded none<br>Discharged 52 | Arr. 16′02″F.<br>Dep. 16′00″F. | 21′06″A.<br>21′06″A. | 18′10″M.<br>18′09″M. |
| Montevideo | Discharged 268<br>Loaded 158 | Arr. 16′07″F.<br>Dep. 17′06″F. | 22′07″A.<br>21′04″A. | 19′07″M.<br>19′05″M. |
| Buenos Aires | Discharged 1087<br>Loaded 1324 | Arr. 17′10″F.<br>Dep. 18′00″F. | 21′02″A.<br>21′08″A. | 19′06″M.<br>19′10″M. |
| Santos | Discharged 139<br>Loaded 4459.8 | Arr. 17′00″F.<br>Dep. 25′03″F. | 22′00″A.<br>26′05″A. | 19′06″M.<br>25′10″M. |
| Rio de Janeiro | Discharged 12.5<br>Loaded 853.8 | Arr. 25′00″F.<br>Dep. 26′00″F. | 26′04″A.<br>27′06″A. | 25′08″M.<br>26′09″M. |
| Curacao | Discharged None<br>Loaded (10,624 bbls. fuel) | Arr. 24′08″F.<br>Dep. 26′10″F. | 25′08″A.<br>27′08″A. | 25′02″M.<br>27′03″M. |
| New Orleans | Discharged | Arr. 26′07″F. | 28′05″A. | 27′06″M. |

c) The draft of the Del Sud at Santos on Voyage 36 and on prior voyages during the previous year was as follows:

| | Arrival | | | Departure | | |
|---|---------|---|---|-----------|---|---|
| **Voy. 30** | | | | | | |
| SB | 21′10″F. | 25′10″A. | 23′10″M. | 19′04″F. | 24′08″A. | 22′00″M. |
| NB | 16′06″F. | 21′04″A. | 18′11″M. | 20′08″F. | 25′10″A. | 23′03″M. |
| **Voy. 31** | | | | | | |
| SB | 20′02″F. | 26′08″A. | 23′05″M. | 18′06″F. | 26′00″A. | 22′07″M. |
| NB | 17′02″F. | 21′04″A. | 19′03″M. | 19′06″F. | 23′04″A. | 21′05″M. |
| **Voy. 32** | | | | | | |
| SB | 19′04″F. | 25′04″A. | 22′04″M. | 17′06″F. | 26′00″A. | 21′09″M. |
| NB | 16′02″F. | 20′02″A. | 18′02″M. | 18′00″F. | 22′10″A. | 20′05″M. |
| **Voy. 33** | | | | | | |
| SB | 16′03″F. | 22′05″A. | 19′04″M. | 15′00″F. | 22′00″A. | 18′06″M. |
| NB | 17′10″F. | 21′04″A. | 19′07″M. | 17′06″F. | 23′08″A. | 20′07″M. |
| **Voy. 34** | | | | | | |
| SB | 18′01″F. | 25′06″A. | 21′10″M. | 17′00″F. | 24′06″A. | 20′09″M. |
| NB | 15′04″F. | 21′04″A. | 18′04″M. | 18′00″F. | 22′06″A. | 20′03″M. |

|  | Arrival |  |  | Departure |  |  |
|---|---|---|---|---|---|---|
| **Voy. 35** |  |  |  |  |  |  |
| SB | 17′04″F. | 20′08″A. | 19′00″M. | 16′04″F. | 19′08″A. | 18′00″M. |
| NB | 15′00″F. | 22′02″A. | 18′07″M. | 17′02″F. | 24′00″A. | 20′07″M. |
| **Voy. 36** |  |  |  |  |  |  |
| SB | 16′02″F. | 21′06″A. | 18′10″M. | 16′00″F. | 21′06″A. | 18′08″M. |
| NB | 17′00″F. | 22′00″A. | 19′06″M. | 25′03″F. | 26′05″A. | 25′10″M. |

### IV.

On September 2 at Montevideo, and September 5 at Buenos Aires, the cases of corned beef which were ultimately damaged by sea water were loaded aboard the Del Sud and stowed in the lower 'tween deck of the No. 2 hold.

On September 9 and 10 at Santos, the bags of coffee which were ultimately damaged by sea water were loaded aboard and stowed in the No. 2 lower hold and in the square of the hatch between the No. 2 lower 'tween deck and lower hold.

### V.

Upon arrival at Santos on September 9, 1952, the Del Sud moored portside to her customary berth at Dock 15. The facing of this dock is of concrete. At 2133 hours on September 10, 1952, after loading heavily, the Del Sud made ready for her customary maneuver away from the dock. She singled up her mooring lines and a local Santos pilot came aboard to unberth the vessel. Her engines were put on standby at 2157 hours. The Tug Neptune made fast on the starboard quarter of the Del Sud with a hawser in order to swing the stern of the Del Sud away from the dock and out into the channel to permit her to turn about in a counter-clockwise manner. To accomplish this maneuver, the stern mooring lines were cast off beginning at 2208 hours and the bow spring line and breast line were held fast to the dock in order to hold the port bow at the dock while the stern was brought out into the channel by means of the Tug Neptune hauling on the hawser from the tug's stern at about right angles to the ship. At 2214 hours the engines of the Del Sud were put astern. During the said maneuver, when the port shell plating of the Del Sud just forward of where the curvature of the hull begins at No. 2 hold rolled in contact with the concrete facing of the dock, the lip of an overboard discharge line, which stood out two inches from the shell plating, pressed against the concrete dock, causing a fracture in the shell plating about 12 inches in length and ½ inch in width just below the protruding lip of the overboard discharge line. The fracture was located in the fifth strake below the sheer strake and about two feet above the water with the vessel trimmed as she was for departure from Santos, in the way of No. 2 lower 'tween deck on the port side. It resulted from the pressure of contact between the hull and the concrete dock due to the unusually heavy load and deep draft of the vessel.

### VI.

It was customary for two cork fenders about 18″ in length and 18″ in diameter to be used over the side of the Del Sud during the undocking maneuver at Santos to prevent damage to both the vessel and the dock. However, during the undocking of the vessel on Voyage 36 at Santos, in spite of the fact that even the use of two fenders could not prevent some points of contact, only one cork fender was used and it was accordingly impossible to avoid contact between the hull and the concrete facing of the dock as the hull rolled against the dock when the after end of the vessel was maneuvered out into the channel.

### VII.

The crack in the hull of the Del Sud described in Paragraph V occurred before the vessel left the dock at Santos and while her forward lines were still made fast to the mooring facilities on the dock.

### VIII.

The impact which caused the damage to the hull was unusual and severe and the shock or vibration was felt by personnel aboard the Del Sud. Chief Radio Officer Theodore Hergenrader was on deck near the Radio Room at the time of impact and to him the impact felt like the Del Sud had hit something solid. He could feel the vibration and to him it was similar to the jar he felt aboard the Del Sud when a lumber schooner hit the Del Sud a glancing blow. Ship's Physician William A. Love was in the deck cafe at the time of impact and felt the vibration and bump which seemed to him as though the vessel had been forced against the dock. Chief Engineer John L. Cullen was in the engine room at the time of impact and felt the vibration from the impact which he thought had been caused by the ship striking a crane on the dock when the bow came around.

### IX.

The regular master of the Del Sud was Captain Williams. On Voyage 36, Adin Tooker acted as Relief Master and was on the bridge at the time of impact with the dock and knew at that time that an impact between the vessel and the dock of unusual severity had occurred. In spite of such knowledge, no effort was made to determine whether the Del Sud had sustained damage to her hull as a result of the impact until the vessel returned to New Orleans.

### X.

Upon experiencing the impact of the ship with the dock at Santos, Chief Engineer Cullen felt that the impact was severe enough to warrant entry of the incident in the engine room log, but before doing so called the bridge on the telephone to ascertain what entry was being made in the bridge log. He spoke to Junior Third Mate Dobson. Dobson in turn advised Captain Tooker of Cullen's inquiry and in reply Captain Tooker stated that no entry was to be made in the bridge log, which information was transmitted over the telephone to Cullen by Dobson. These conversations took place while the forward lines of the Del Sud were still made fast to the dock at Santos. In order to avoid a discrepancy between the bridge log and the engine room log, Cullen decided to make no engine room log entry of the incident and none in fact was made in the bridge log or the engine room log.

### XI.

On the night of September 10, 1952, upon departure from Santos, the Del Sud was loaded to the deepest draft she had ever been when leaving this dock at Santos, drawing 25 feet 3 inches forward and 26 feet 5 inches aft. The water level was 7 feet 5/8 inches below the top of the dock when the Del Sud prepared to depart from Santos. The Del Sud's draft, at that tidal stage, brought the lip of the overboard discharge on the port side 2 feet 8 7/8 inches above the water and the lip was then 4 feet 3 3/4 inches below the top of the concrete dock. With the vessel loaded as heavily as she was, and with the water level as it was, respondent's customary undocking maneuver made damage to the hull of the Del Sud extremely probable if not inevitable.

### XII.

Although no seawater could or did enter through the crack in the Del Sud's hull as she lay in the harbor at Santos because the crack was approximately two feet above the water line, as the Del Sud put to sea for Rio de Janeiro seawater began to enter through the crack due to the swells of the sea, normal roll of the vessel, and buildup of water at the bow, all of which caused the crack to be submerged at times, and seawater continued to enter the No. 2 hold during the remaining stages of her voyage until arrival at New Orleans, Louisiana. The entrance of seawater resulted in damage to much of the cargo loaded at Monte-

video, Buenos Aires, and Santos and stowed in the No. 2 lower hold and lower 'tween deck.

### XIII.

At 0800 hours on September 11, 1952, while approaching Rio de Janeiro, a sounding of the bilge well below the No. 2 hold of the Del Sud disclosed 5 inches of water. Prior to Santos, the bilge had been dry. At 1200 hours on September 11, 1952, the Del Sud arrived in Rio de Janeiro, Brazil, and moored port side to Dock No. 7. The afternoon sounding of the bilge well below the No. 2 hold of the Del Sud disclosed 10 inches of water.

### XIV.

After loading cargo at Rio de Janeiro, the Del Sud departed at 2304 hours on September 11, 1952, for Curacao, B. W. I. without respondent's having surveyed the vessel's hull to determine why she was taking water. On the voyage from Rio de Janeiro to Curacao, there was a maximum of 24 inches of water in the bilge well of No. 2 hold, and on the voyage from Curacao to New Orleans, there was a maximum of 8 inches of water in the bilge well of the No. 2 hold. The bilges were pumped continuously commencing on September 12, and in spite of pumping the water reached the maximums herein stated. It is obvious that water was entering the lower 'tween deck and draining down into the lower hold throughout the various stages of the voyage after the vessel departed Santos. It is impossible to determine what degree of damage was caused to the cargo during the various stages of the voyage from Santos to Rio de Janeiro, from Rio de Janeiro to Curacao, and from Curacao to New Orleans.

### XV.

In the ports of Rio de Janeiro and Santos, respondent's vessels are serviced by Delta Line, Inc., a wholly-owned subsidiary of respondent, which functions in the capacity of husbanding agent, booking agent, stevedores, stevedoring supervisor and passenger agent and performs all other functions relating to the operations of respondent at those ports.

### XVI.

While the primary cause of the damage to cargo was the vessel's departure from Santos in an unseaworthy condition, the failure of respondent to take proper steps in the port of Rio de Janeiro to discover and repair the damage to the hull of the Del Sud resulted in further damage to the cargo in the No. 2 lower hold and 'tween deck, since, in spite of continuous pumping of the bilges, the water therein reached its maximum height of 24 inches after the Del Sud left Rio de Janeiro for Curacao on the northbound voyage.

### Conclusions of Law

### I.

The subject matter of this litigation, a claim for damage to cargo while on the high seas, is within the admiralty and maritime jurisdiction of the Court, 28 U.S.C. § 1333.

### II.

The carriage of cargo involved in this litigation was pursuant to the U. S. Carriage of Goods by Sea Act of April 16, 1936, 46 U.S.C.A. §§ 1300–1315.

### III.

█ Section 3 of the U. S. Carriage of Goods by Sea Act requires the carrier to exercise due diligence to make the ship seaworthy "before and at the beginning of the voyage". A breach of this obligation, which proximately results in damage to cargo, renders the carrier liable to cargo for the damage. The carrier must not only discharge the obligation to exercise due diligence to make the ship seaworthy at all times before the beginning of the voyage, but also must exercise due diligence to make the ship seaworthy at and during that interval of time which may be said to comprise the actual "beginning of the voyage".

### IV.

█ A "voyage", as the term is used in Section 3 of the U. S. Carriage of Goods by Sea Act, does not begin, insofar as a particular cargo is concerned, until the vessel departs from the port at

which the particular cargo is lifted and loaded aboard the vessel. As to the cargo which was loaded at Santos, respondent had the obligation to use due diligence to make the ship seaworthy before and at the beginning of the voyage from Santos. Union Carbide & Carbon Corp. v. United States, 2 Cir., 1952, 200 F.2d 908.

## V.

■■ A voyage begins only when the vessel breaks ground or leaves her moorings in complete readiness for sailing and proceeding to sea. The Willowpool, D.C., 12 F.Supp. 96. The Newport, 9 Cir., 7 F.2d 452. When the damage occurred to the Del Sud she had not left her moorings at Santos in complete readiness for sailing and proceeding to sea since her bow spring line and breast line were still made fast to the mooring facilities of the dock at Santos. Therefore, the vessel was damaged and rendered unseaworthy before the voyage from Santos had begun and was not seaworthy at the beginning of the voyage within the meaning of Section 3 of the U. S. Carriage of Goods by Sea Act.

## VI.

■ Insofar as cargo loaded at Santos is concerned, the carrier failed to exercise due diligence to make the Del Sud seaworthy before and at the beginning of the voyage since the occurrence of the unusual and severe impact when the Del Sud rolled against the dock at Santos, which rendered the vessel unseaworthy, was known to responsible personnel aboard the Del Sud, including the navigating personnel on the bridge, before the voyage had begun, and the obligation imposed by Section 3 of the Carriage of Goods by Sea Act required that a diligent effort be made to determine whether the vessel had sustained damage.

## VII.

■ Respondent's breach of the obligation imposed by Section 3 of the Carriage of Goods by Sea Act was the proximate cause of the damage to cargo loaded on board the Del Sud at Santos.

## VIII.

■ Even before the undocking maneuver began, respondent had breached the obligation imposed by Section 3 of the Act by loading the Del Sud so heavily at Santos that the resulting pressure on her hull during the undocking maneuver made hull damage extremely probable if not inevitable. To so load the vessel as to make hull damage during a customary maneuver inevitable, or even probable, constituted a failure to exercise the degree of diligence required by Section 3 of the Act. Interlake Iron Corporation v. Gartland SS Co., 6 Cir., 1941, 121 F.2d 267.

## IX.

■ Respondent had an obligation to anticipate and guard against the type of damage which the vessel sustained and its failure to do so, either by providing for the use of a sufficient number of adequate fenders, and instructing its personnel accordingly, or if the fenders could not give the necessary protection to the hull during the customary undocking maneuver, then by providing for the use of an undocking maneuver which did not place undue strain on the hull of the vessel, constituted a lack of due diligence to make the vessel seaworthy before and after the beginning of the voyage from Santos. Spencer Kellog & Sons v. Great Lakes Transit Corp. (The Fred W. Sargent), D.C., 32 F.Supp. 520.

## X.

■ The obligation to exercise due diligence which is imposed by Section 3 of the Act is not limited by the provisions of Section 4(2) of the Act. If any action or inaction on the part of the carrier or its agents which might otherwise be excused under Section 4(2) of the Act renders the vessel unseaworthy before or at the beginning of the voyage, there is a breach of the obligation imposed by Section 3 if the resulting unseaworthiness could have been discovered by the exercise of due diligence and was not discovered, and the carrier is responsible for the resulting damage to cargo.

## XI.

Respondent maintained a shore establishment in Rio de Janeiro which performed all of its operating functions in that port. When the Del Sud entered Rio in her damaged condition on the northbound leg of Voyage 36, her management was not solely in the hands of her Master and crew as it is on the high seas. The vessel was in respondent's hands once again, and the duty to exercise due diligence was renewed. It was incumbent upon respondent to exercise due diligence to make the Del Sud seaworthy before and at the beginning of her voyage from Rio de Janeiro to New Orleans by way of Curacao. Respondent's failure to conduct a survey or any examination of the hull of the Del Sud prior to its departure from Rio on the northbound leg of Voyage 36, in spite of the impact with the dock at Santos and in spite of the fact that she was taking water on the voyage from Santos to Rio de Janeiro (see The Willowpool, D.C., 12 F.Supp. 96), renders respondent liable for subsequent damage to the cargo loaded at Buenos Aires and Montevideo, even though the Del Sud was seaworthy upon departure from these ports. May v. Hamburg-Amerikanische, etc. (The Isis), 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348, 1933 A.M.C. 1565. Since the Del Sud took substantial quantities of water in the No. 2 hold on each leg of the voyage between Santos and New Orleans, it is impossible to determine what portion of Buenos Aires and Montevideo cargo was damaged, and to what extent, on the voyage from Santos to Rio, the voyage from Rio to Curacao, and the voyage from Curacao to New Orleans; the carrier bears the burden of segregating the damage for which it is responsible from the damage for which it may be excused, and failing to carry this burden, is responsible for the salt water damage to all cargo in the No. 2 hold, whether loaded prior or subsequent to the damage incurred at Santos which made the vessel unseaworthy. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373, 1934 A.M.C. 1573.

## XII.

Libellants are entitled to recover from respondent for the amount of salt water damage sustained by the shipments loaded aboard the Del Sud at Buenos Aires, Montevideo and Santos and stowed in the No. 2 hold.