## W. T. LOCKETT CO. v. CUNARD S. S. CO., Limited.

District Court, E. D. New York. June 2, 1927.

### No. 8008.

**1. Shipping ⚖➡121(1)—In every contract of affreightment there is an implied absolute warranty of seaworthiness.**

Underlying every contract of affreightment there is an implied absolute warranty of seaworthiness of vessel.

**2. Shipping ⚖➡121(2)—Latent defect in hose used to press up vessel's deep tank rendered vessel "unseaworthy."**

Latent defect in hose used to press up vessel's deep tank, which defect existed at commencement of voyage, rendered ship "unseaworthy."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unseaworthy.]

**3. Shipping ⚖➡121(1)—Diligence in making ship seaworthy does not absolve owner from absolute obligation to furnish seaworthy vessel.**

The exercise of due diligence to make a ship seaworthy does not absolve an owner from his absolute obligation to furnish a seaworthy vessel, unless he unequivocally so contracts.

**4. Shipping ⚖➡137—Vessel owner is not relieved from liability for unseaworthiness without showing diligence to make ship seaworthy at commencement of voyage (Harter Act [Comp. St. §§ 8029–8035]).**

Owner of vessel cannot relieve itself from liability arising from unseaworthiness of vessel, either under Harter Act (Comp. St. §§ 8029–8035), or Hague Rules of 1921, without showing that it exercised due diligence to make the ship seaworthy at commencement of voyage.

**5. Shipping ⚖➡121(1)—Inspection of new hose by vessel owner's purchasing agent held not to relieve owner from liability for cargo damages sustained on bursting of old hose.**

In libel for damages to cargo injured by water on bursting of hose used to press up deep tank, examination and passing of hose by vessel owner's purchasing agent did not relieve owner from liability for damages because, even if such inspection was proper, it applied only to new hose and new hose was not used.

**6. Shipping ⚖➡132(5½)—Evidence held to show unseaworthiness of vessel at commencement of voyage, caused by lack of proper inspection of hose, which burst and damaged cargo.**

In libel for damages to cargo, injured by water on bursting of hose used to press up deep tank of vessel, evidence *held* to show that as respects such hose vessel was unseaworthy at commencement of voyage, and that such unseaworthiness was caused by want of due diligence in discovering latent defects in hose by proper inspection.

**7. Shipping ⚖➡137—Cargo damage caused by failure to close ventilator held caused by negligent manner of caring for cargo, and not by negligent navigation (Harter Act, § 1 [Comp. St. § 8029]).**

The fact that damage to cargo was caused by failure to close lid of ventilator, through which water entered when hose used to press up deep tank burst, *held* not to exonerate ship from liability under either Harter Act (Comp. St. §§ 8029–8035) or Hague Rules 1921, art. 4, § 2, since, even if failure to close ventilator lid was sole cause of the damage, such failure was not an error in the management of the ship, but was negligence in the care and custody of the cargo, for which the ship was responsible under Harter Act, § 1.

In Admiralty. Libel by the W. T. Lockett Company against the Cunard Steamship Company, Limited. Decree for libelant.

Bigham, Englar & Jones, of New York City, for libelant.

Lord, Day & Lord, of New York City, for respondent.

CAMPBELL, District Judge. This is an action in personam in a case of cargo damage, civil and maritime, against the Cunard Steamship Company, Limited, as owner and operator of the steamship Samaria. The receipt of a shipment of 22 bales of new wool rags, in apparent good order and condition, on board the steamship Samaria, at Liverpool, England, on or about August 22, 1924, and the subsequent discharge of said shipment from the Samaria in apparent bad order and condition, at Boston, Mass., is admitted.

The facts were stipulated by the proctors for the respective parties. It was agreed that the damage was due to sea water, which had access to the shipment during the course of

the voyage, under the following circumstances:

"Seventh. On August 24, 1924, under supervision of the ship's officers, the deep tank was pressed up. For this purpose, the ship's carpenter took a hose from the hose locker and connected it to a hydrant located on the weather deck. From the hydrant, the carpenter led the hose over the top of a mushroom ventilator used to ventilate No. 3 hold, the top of the ventilator being about five feet above the deck; from the top of the ventilator the hose was led to the sounding pipe of the deep tank. The water was then turned on at half pressure. At the top of the ventilator there was a lid, which was open and which the carpenter failed to close. Thereafter the hose burst at the top of the ventilator and water escaped into the ventilator shaft through the open lid, thereby damaging the bales of wool rags above referred to.

"Eighth. The hose burst because of a latent defect which existed at the commencement of and prior to the voyage."

The bill of lading merely "incorporated by reference the provisions of the Hague Rules of 1921," and did not contain any specific exceptions or reference to possible unseaworthiness of the vessel. The pertinent provisions of the said Rules are as follows:

"Article IV—Rights and Immunities.

"1. Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped and supplied.

"2. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship:

*    *    *    *    *

"(p) Latent defects not discoverable by due diligence;

"(q) Any other cause arising without the actual fault or privity of the carrier, or without the fault or neglect of the agents, servants or employees of the carrier."

It was agreed that the hose which the carpenter used to press up the deep tank, the bursting of which hose caused the damage complained of in this action, "burst because of a latent defect which existed at the commencement of and prior to the voyage," and

the following were the only facts appearing from the stipulation or admitted in the pleadings with reference to what inspection had been made of the hose in question before the commencement of the voyage:

"Ninth. All hoses used on board the S. S. Samaria are requisitioned from the Cunard General Stores at Liverpool. All these hoses are examined and passed by the purchasing agents of the Cunard Company as being fit for the purpose, among others, of pressing up deep tanks. At the end of each voyage, the carpenter requisitions the number of hoses he needs from the Cunard General Stores. These new hoses are placed on board the steamship Samaria in the carpenter's locker and are passed by the carpenter as being fit for his purposes.

"The steamship Samaria sailed from Boston to Liverpool on August 3, 1924, arriving at Liverpool on August 11, 1924. Thereafter the Samaria sailed for Boston on August 22, 1924.

"On the last days of the voyage from Boston to Liverpool, the ship's carpenter looked over the supply of hoses in his locker and removed all of the ones which he considered were not in sufficiently good condition to be used for pressing up deep tanks. It is an unwritten rule of the Board of Trade in England that a hose must not be in use for a longer period than two years. No hose on the Samaria is used for a longer period than 2 years. In fact, it is very unusual that a hose is in use for pressing up tanks for a longer period than 6 months. The particular hose used for pressing up the tank on August 24, 1924, on the voyage from Liverpool to New York commencing August 22, 1924, had not been used more than four or five times prior to August 24, 1924. It is not known just when this particular hose was placed on board the Samaria, but the ship's officers believe that it was not on the vessel for longer than 6 months.

"The hose used to press up the tank on August 24, 1924, was among the hoses which the carpenter examined on the last days of the voyage from Boston to Liverpool ending August 11, 1924, and which he considered fit for the purpose of pressing up deep tanks. Upon the arrival at Liverpool on August 11, 1924, the carpenter requisitioned from the Cunard General Stores two new hoses. These hoses were placed on board in the carpenter's locker and were inspected by the carpenter at that time. The carpenter only receives hoses which, in his opinion, are in perfect condition.

"The hoses on board the steamship Sa-

maria, including the hose used to press up the deep tank on August 24, 1924, were, in the opinion of the carpenter of the vessel, in good order and condition at the commencement of the voyage from Liverpool to Boston on August 22, 1924."

[1] Underlying every contract of affreightment there is an implied absolute warranty of seaworthiness. The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644.

[2] The latent defect in the hose, which "existed at the commencement of and prior to the voyage," rendered the Samaria unseaworthy. The only provision of the bill of lading on which respondent relies to limit its absolute warranty of seaworthiness, or exempt itself from the consequences of the aforesaid breach thereof, is its incorporation, by reference, of the provisions of the Hague Rules of 1921, supra.

The provisions of the said rules do not specifically provide for unseaworthiness existing at the commencement of the voyage, and libelant contends that they operated prospectively only, and did not relate to a condition of unseaworthiness existing at the commencement of the voyage, but only to a state of unseaworthiness arising during the voyage. The Carib Prince, 170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181.

[3] The exercise of due diligence to make a ship seaworthy does not absolve the owner from his absolute obligation to furnish a seaworthy vessel, unless he unequivocally so contracts. The Carib Prince, supra; The Caledonia, supra; The Edith (C. C. A.) 10 F. (2d) 684, 1926 A. M. C. 281.

Respondent contends for a construction of the said Hague Rules by which they will be held to relate to a condition existing at the commencement of the voyage, and cites Hague Rules Explained—Carriage of Goods by Sea, Act of 1924, by Sanford D. Cole, in which it is said, at page 87:

"Seaworthiness.

"Art. IV. 1 has already been dealt with in the notes to Art. III, 1. According to the report of a sous-commission appointed by the Brussels Conference of October, 1922 (see Report of British Delegates, p. 72); art. IV, 1, 'is intended to apply, and does apply, merely to unseaworthiness as defined or described in art. III, 1, and confines the obligation of due diligence to the beginning of the voyage.' In other words (as expressed in the body of the Report of the British Delegates, p. 24), 'the rights and immunities under this paragraph are correlative to the responsibilities and liabilities set out in art. III, 1.''

21 F.(2d)—13

But a comparison of article III, Section 1, of the Hague Rules, which states: "The carrier shall be bound before and at the beginning of the voyage to exercise due diligence to" (and then follow certain responsibilities and liabilities)—with article IV, section 1, of the Hague Rules, which states, "Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness, unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied"— but makes no specific mention of unseaworthiness existing before and at the commencement of the voyage, seems to make such construction out of harmony with the decisions of the Supreme Court. The Carib Prince, supra; The Caledonia, supra.

[4] The determination of the question as to whether the Hague Rules, art. IV, § 1, apply in case of unseaworthiness existing before and at the commencement of the voyage, is not necessary in this case, and therefore I do not decide it, because, regardless of whether article IV, § 1, of the Hague Rules applies, there can be no question that the respondent cannot relieve itself from liability, either under the Harter Act (Comp. St. §§ 8029–8035) or the Hague Rules, without showing that it exercised due diligence to make the ship seaworthy at the commencement of the voyage.

[5] This, in my opinion, it has failed to do. The examination and passing by the purchasing agent of the company of the hose was not sufficient to relieve the respondent, because, even if that was considered a proper inspection, it would apply only to new hose, and by the stipulation it appears that new hose was not used.

[6] The looking over of the supply of hose in his locker by the ship's carpenter, and removal of those not satisfactory, on the last days of the voyage from Boston to Liverpool, was not an inspection which would develop latent defects, and did not constitute due diligence. Compagnie Maritime Francaise v. Meyer (C. C. A.) 248 F. 881; W. R. Grace & Co. v. Panama R. Co. (C. C. A.) 285 F. 718; The Lake Allen (D. C.) 274 F. 873.

The recital of the rule of the Board of Trade is not important, nor is the statement: "The particular hose used for pressing up the tank on August 24, 1924, on the voyage from Liverpool to New York, commencing August 22, 1924, had not been used more than four or five times prior to August 24, 1924"—in view of the statement in the stipulation: "It is not known just when this particular hose

was placed on board the Samaria, but the ship's officers believe that it was not on the vessel for longer than six months."

There is no proof to show when the hose in question had been previously used, and in view of the fact that it burst when the water was turned on, only at half pressure, it clearly appears that, if said hose had been tested at full pressure, when the carpenter selected the hose to be replaced, during the last days of the previous voyage from Boston to Liverpool, the latent defect would have been discovered. I therefore find that the steamship Samaria, in so far as the hose was concerned, was unseaworthy at the commencement of the voyage, and that such unseaworthiness was caused by want of diligence on the part of the respondent.

[7] Respondent contends that it is relieved from liability both under the Harter Act and the Hague Rules (article IV, section 2, supra), because the act of the carpenter in pressing up the deep tank was an act in the management or navigation of the vessel, and that respondent is not liable for damages caused by the carpenter's failure to close the lid at the top of the ventilator. This contention was not sustained, first, because, as I have found, the respondent did not use due diligence to make the ship seaworthy before the commencement of the voyage, and such unseaworthiness was at least a contributing cause, and therefore the exception did not exonerate the respondent from one of the perils to which its negligence, or that of its servants, contributed. The Edwin I. Morrison, 153 U. S. 199, 211, 14 S. Ct. 823, 38 L. Ed. 688; International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 226, 21 S. Ct. 591, 45 L. Ed. 830; The Asuarca (D. C.) 291 F. 73, aff'd (C. C. A.) 291 F. 77; The Wildcroft, 201 U. S. 378, 386, 388, 26 S. Ct. 467, 50 L. Ed. 794.

Even if the failure of the carpenter to close the lid was the sole cause of the damage, such failure was not an error in the management and navigation of the ship, but was negligence in the care and custody of the cargo, from which negligence respondent was not relieved by the bill of lading, nor could it have been under section 1 of the Harter Act. The Germanic, 196 U. S. 589, 25 S. Ct. 317, 49 L. Ed. 610; Andean Trading Co. v. Pacific Steam Nav. Co. (C. C. A.) 263 F. 559; The Edith, supra.

The case of The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241, cited by the respondent, is distinguishable, because the iron shutter, which was not closed, did not open into a cargo space, and because the ship was seaworthy at the commencement of the voyage.

A decree may be entered in favor of the libelant for the amount stipulated, $2,089.55, and with interest from February 16, 1927, and costs.