**LURIA BROS. & CO., Inc., v. EASTERN TRANSP. CO. et al.**

No. 338.

Circuit Court of Appeals, Second Circuit.

May 17, 1937.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for appellant.

Platow, Lyon & Stebbins, of New York City (Leo J. Curren, of New York. City, of counsel), for libelant-appellee.

Lynch, Hagen & Atkins, of New York City (Henry C. Eidenbach, of New York City, of counsel), for other appellees.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

The libelant chartered the respondent's coastwise barge R. W. McDonald and loaded her with a cargo of scrap iron for transportation from Brooklyn, N. Y., to Florence, N. J. Under the charter party the respondent was a private carrier and the Harter Act (46 U.S.C.A. § 190 et seq.) was incorporated by express reference. The barge was in all respects seaworthy and properly manned, equipped, and supplied at the outset of the voyage, when taken in tow by the respondent's tug Montrose; about fifty miles short of her destination she foundered in the Delaware river under circumstances hereafter to be described. She was subsequently raised and the cargo was delivered to the libelant in damaged condition. The libel alleged a cause of action in contract for failure to deliver the cargo in like condition as when received. The respondent impleaded the owners and operators of the tug Arabian, charging that the latter had caused the barge to founder by improperly towing it through heavy ice. At the conclusion of the trial the impleaded respondents and the tug Arabian were exonerated. This appeal raises no question as to them. Eastern Transportation Company, the captain of its tug Montrose, and the master of its barge McDonald were found to be negligent. The appellant attacks these findings and makes the further point that such negligence, if any, was a fault in navigation or management, for which the carrier is excused by section 3 of the Harter Act (46 U.S.C.A. § 192).

The voyage proceeded without incident until Delaware breakwater was reached on the morning of January 23, 1935. There, two other barges in the tow, bound for Norfolk, were left at anchor, and the tug proceeded with the McDonald up the Delaware river. On reaching Reedy Point the tug captain received telephonic advices from the respondent's Philadelphia office that ice conditions further upstream were too bad to permit continuing on to Florence. He was instructed to anchor the barge where he and the barge master thought she could safely lie until she could be taken to destination. Accordingly, he put her on the flats south of the canal jetties at Reedy Point. She came to anchor about 12:30 a. m. on January 24th, and the tug departed at 9 o'clock in the morning to return to the barges left at Delaware breakwater. About 9 o'clock on the evening of the 24th a heavy field of ice came down on the ebb tide, causing the barge to drag her anchor. She drifted in the ice all night, and on the flood tide was carried upstream to Pea Patch Island,

where she got into clear water. She arrived there about 11 o'clock on the morning of the 25th, dropped her anchor, and was able to ask persons on shore to telephone the respondent's office for help. Upon receiving this message, the respondent at once arranged with the impleaded Martin Company to send a tug to the assistance of the McDonald and another barge, the Hooper, anchored at the Reedy Point flats. The Martin tug Adriatic arrived in the evening of the 25th, but became disabled before it could lend aid to the McDonald. On the flood tide, pursuant to instructions of the Adriatic's master, the McDonald was allowed to drift upstream until she was in danger of grounding on a shoal, when the anchor was again dropped. Another message for help was transmitted to the respondent's. Philadelphia office and another tug, the Arabian, was promptly sent to the rescue. The Arabian arrived at the scene about 11 a. m. on January 26th and took the tug Adriatic, the barge Hooper, and the barge McDonald, one at a time in the order named, to a pier at Newcastle, where they were protected from the ice by stone icebreakers. While drifting in the ice on the morning of the 25th, the McDonald had begun to leak, but her pumps had been able to hold the leaks. Shortly after she was moored at the Newcastle pier, however, she began to fill despite the pumps. Another tug was despatched to her aid, but before it arrived the McDonald had settled on the bottom, and on the flood tide her decks were submerged. After she was raised, it was found that the ice had cut holes in her port bow and sides along the loaded water line. The court found that she sustained no damage while in the custody of the tugs Adriatic and Arabian, but that the master of the tug Montrose was negligent in leaving the McDonald in an exposed place, knowing the ice menace; that the respondent ignored the barge for about two days and took no steps to protect her; and that the master of the barge did not summon aid while dragging in the ice, although he realized the dangers of his situation. The libelant was awarded a decree against Eastern Transportation Company.

█ The appellant makes a strong argument that the findings of negligence on the part of the tug captain and the barge master cannot be supported. All that the captain of the Montrose knew was that ice conditions further upstream were such that he could not continue to destination. He was instructed by his office to anchor in a safe place, and he and the barge master thought that the anchorage at Reedy Point below the jetties was safe. No heavy ice was then visible and no evidence was offered to show that he had reason to expect the heavy ice upstream to break up and come down in large floes in the near future. The charge against Melvin, the barge master, was his failure to display distress signals after the barge began to drag; but he explained that this was because he saw no tug which might have come to his assistance. On the following day, when he did see a tug, he sounded distress signals, but they were ignored. As soon as he got to Pea Patch Island, where it was possible to send a message for help to his office, he did so. Whether these arguments should prevail we need not decide. Even if the findings be allowed to stand, the negligence of the tug captain was in selecting an unsafe anchorage, and the negligence of the barge master was in failing to give signals of distress while his vessel was adrift. These were faults in navigation or management of the barge, for which section 3 of the Harter Act (46 U.S.C.A. § 192) gives exemption. See The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; The Etona, 64 F. 880, 882 (D.C.S.D.N.Y.), affirmed 71 F. 895 (C.C.A.2); Bradley v. Lehigh Valley R. Co., 153 F. 350, 352 (C.C.A.2); The John J. Grimes, 57 F.(2d) 321, 323 (D.C.S.D.N.Y.); Hanson v. Haywood Bros. & Wakefield Co., 152 F. 401, 402 (C.C.A.7).

█ The finding that the appellant's agents at its Philadelphia office negligently ignored the barge for about two days and took no steps to protect it is not supported by the evidence. Their instructions to the tug captain were to anchor the barge in a safe place; they did not know what anchorage he selected and had no reason to suppose that the McDonald was not safe until her message for help was telephoned from Pea Patch Island about noon on January 25th. Upon receipt of this, the tug Adriatic was promptly sent to her rescue, and subsequent calls for aid were likewise promptly acted upon. The libelant's contention that to anchor the barge in a place thought to be safe, even though it were negligent so to think, amounted to a deviation, is supported by no authorities, and is plainly not sustainable.

Decree reversed and libel dismissed.