GRACE LINE, INC., Plaintiff-Appellee,

v.

TODD SHIPYARDS CORPORATION, Defendant-Appellant.

HOME INSURANCE COMPANY et al., Plaintiffs-Appellants,

v.

S. S. SANTA ANA, etc., et al., Defendants-Appellees.

GRACE LINE, INC. (PRUDENTIAL–GRACE LINES, INC.), Plaintiff-Appellant,

v.

TODD SHIPYARDS CORPORATION et al., Defendant-Appellee.

GRACE LINE, INC., et al., Plaintiffs-Appellees,

v.

TODD SHIPYARDS CORPORATION, Defendant-Appellant.

Nos. 72–1296, 72–1336, 72–1298 and 72–1297.

United States Court of Appeals, Ninth Circuit.

May 20, 1974.

George L. Waddell (argued), James D. Boughey, of Dorr, Cooper & Hays, San Francisco, Cal., George L. Varian, of Crowell, Rouse & Varian, New York City, for appellant Todd Shipyards Corp.

John R. Pascoe (argued), of Cushing, Cullinan, Hancock & Rothert, San Francisco, Cal., for Grace Line Inc.

James D. Boughey (argued), of Dorr, Cooper & Hays, San Francisco, Cal., George L. Varian, of Crowell, Rouse & Varian, New York City, for appellees Todd Shipyards Corp. and others.

Robert W. Wyckoff (argued), of Wyckoff & Cunningham, Frederick G. Harris (argued), of Patmont & Myers, San Francisco, Cal., for appellants Home Ins. Co. and others.

Carter Quinby (appeared), of Derby, Cook, Quinby & Tweedt, James D. Boughey, of Dorr, Cooper & Hays, John R. Pascoe, Cushing, Cullinan, Hancock & Rothert, San Francisco, Cal., George L. Varian, of Crowell, Rouse § Varian, New York City, for appellees S. S. Santa Ana and others.

## OPINION

Before KOELSCH, CARTER and WALLACE, Circuit Judges.

JAMES M. CARTER, Circuit Judge:

This case arises out of a collision between a steamship and a drydock. We are presented with issues of negligence, the propriety of prejudgment interest, the scope of the United States Carriage of Goods by Sea Act, the interpretation and validity of so-called "Himalaya" clauses in bills of lading, and laches. Notwithstanding the number and complexity of the legal issues and the number of parties involved, the facts are rather simple.

### Facts

The *Santa Ana* is a 10,000-ton cargo steamship owned and operated by Grace Lines, Inc. (hereafter Grace). On December 8, 1967, the steamship arrived in San Francisco Bay laden with cargo of coffee, lumber, corned beef and quebracho. These goods were insured, respectively, by *Home Insurance Company* (hereafter Home), *Atlantic Mutual Insurance Company* (hereafter Atlantic Mutual), *Royal Globe Insurance Co.* (hereafter Royal Globe), *and Commercial Insurance Company of Newark* (hereafter Commercial).

During a voyage by a cargo steamship, it is customary for the vessel to enter a drydock for inspection and repair. With this purpose, the *Santa Ana* steamed into the Oakland Estuary where its intended drydock was located. This was Drydock No. 2, operated by *Todd Shipyards Corporation* (hereafter Todd).

Ordinarily, Captain Fillipow commanded the *Santa Ana*, but a special pilot named Carlier took the helm in order to perform the delicate operation of entering the drydock. Pilot Carlier was an employee of *Shipowners & Merchants Towboat Company, Ltd.* (hereafter S & M Towboat), which also supplied tugboats to assist in the maneuvers.

The Oakland Estuary runs generally east to west, and Drydock No. 2 is on the south shore. After heading east up the estuary until reaching the drydock, the steamship made a 90° turn to the south and aimed towards the drydock's entry.

To picture the accident, it is necessary to understand the design of Drydock No. 2. Known as a Harris self-docking dry-

dock, it resembles a long miter box having a bottom and two side walls, but no top or end walls. The structure is 528 feet long and 90 feet wide, and points into the estuary. When a vessel approaches for entry, the drydock is submerged by filling water tanks within the walls. After the vessel is floated into position over the drydock, the water tanks are pumped out and the drydock, rising from its own buoyancy, lifts the vessel high and dry.

The drydocking of the *Santa Ana* might have gone all right except for a special feature of Drydock No. 2. As we mentioned above, Drydock No. 2 is "self-docking," meaning that it can drydock itself whenever it needs maintenance. Without going into the mechanics of this feat, we need only observe that a special recess in the ends of the side walls makes it possible. These walls, for the most part, are flat on top, forming a long narrow deck. At the outmost ends, however, the deck takes a step-like recess. The top of the recessed portion is eleven feet lower than the rest of the wall. Thus, when the drydock is submerged, the side walls stick above the water except at the ends, where the recessed portion of the wall lies under the water, unseen.

At the time Pilot Carlier proceeded to navigate the steamship into the submerged drydock, an eastward breeze and a flowing tide pushed against the vessel on the starboard (i. e., right hand) side. No finding was made, and nobody can say for certain, whether this starboard pressure was what made the steamship enter the drydock as it did, off-center, towards the port (i. e., left hand) side. The port side hull rammed into the unseen recessed wall, ripping a hole in the vessel beneath the water line. Besides damaging the steamship, the collision caused injury to the drydock and allowed flooding water to injure the cargo. The steamship, however, was ultimately drydocked and repaired by Todd.

Out of this accident arose four law suits. (1) Grace, the owner of the steamship sued Todd, the operator of the drydock, for the damages to the vessel and resultant damages. Todd filed a counterclaim against Grace for the damages to the drydock and for the money Todd had spent in repairing the ripped hull. Todd also filed a third-party complaint for the dock damage against S & M Towboat, which employed Pilot Carlier and the tugboats. (2) Two cargo insurers, Home and Atlantic Mutual, joined in suit against Grace, the *Santa Ana* itself, Todd and S & M Towboat for damage to the coffee and lumber. (3) Commercial brought a separate suit against the same defendants for damage to the quebracho. (4) Royal Globe likewise brought a separate suit against the same defendants for damage to the corned beef.

The suits were consolidated and tried to the district court. In its findings and conclusions, the court held that Todd was negligent and hence liable to Grace in the net amount of $17,265.03; that Todd, though negligent, was entitled to immunity against the cargo insurers; and that neither Grace nor S & M Towboat were negligent or liable· to any party.

In the two appeals (by Todd and the cargo insurers) and the two cross-appeals (by Grace and Todd), we face the following questions:

(1) Did the trial court err in finding Todd negligent?

(2) Did the trial court err in finding that there was no negligence on the part of the *Santa Ana*, Grace or S & M Towboat?

(3) Did the trial court err in refusing to grant pre-judgment interest to Grace?

(4) Did the trial court err in holding that Todd is entitled to the same exemptions and immunities from and limitations of liability which Grace has against the cargo interests (these exemptions, immunities and limitations primarily being those that the United States Carriage of Goods by Sea Act provides specifically for carriers)?

As elaborated below, we answer questions (1), (2) and (3) in the negative, affirming the district court on those points. We conclude, however, that question (4) should be answered in the affirmative; we therefore reverse the district court's holding that Todd is entitled to immunity from liability to the cargo insurers.

## I. *Todd's Negligence*

The district court found that Drydock No. 2 was negligently constructed and maintained in that it had a concealed and dangerous projection when submerged for drydocking a vessel, and that the damage to the steamship was caused by Todd's negligent maintenance of the drydock in such a dangerous condition. The court further found that Grace and S & M Towboat were unaware of the existence of said concealed, underwater danger on the day of the collision.

Todd does not dispute the finding that it failed to exercise due care. Todd contends, however, that the evidence clearly shows that the pilot of the steamship was aware of the dangerous condition and that his awareness extinguished Todd's duty of due care towards the vessel.

The leading case regarding the duty of care incumbent upon those operating wharfs, drydocks, and so forth, is Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756 (1898). There the Court stated (at p. 433):

> "Although a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and if there is any dangerous obstruction to remove it, *or to give due notice of its existence to vessels about to use the berths.*" (Emphasis supplied)

■ Todd contends that, since its duty is fulfilled by giving notice to the vessel of the danger, necessarily there is no duty to fulfill if the vessel already knows of the danger. We accept this principle, as have other courts. See, for example, General Construction Co. v. Isthmian Lines, Inc. (D.Ore.1966) 259 F.Supp. 336, 338–339, where it was accurately observed that "The general concept of a formal notice which seemed to originate in Smith v. Burnett . . . is not applied where the alleged construction or condition is open and *obvious* to those in charge of the vessel's management. Here, the absence of constructive notice, must give way to the finding of actual notice." (Emphasis added)

■ Todd further contends that the evidence clearly established that the pilot of the steamship had sufficient awareness of the danger to invoke this principle. Here we disagree. It must be kept in mind that on this issue we are concerned with the existence of a duty of care on Todd's part, and not with the question of the pilot's negligence, considered hereafter. Regardless of whether the pilot *should* have been aware of the danger, Todd had a duty to remove it or to give notice unless the pilot was *actually* aware of it.

■ The testimony of the pilot indicates indisputably that he had knowledge of prior accidents caused by the hidden recess in the drydock. This being so, perhaps he should have anticipated the collision to the *Santa Ana*. But his knowledge of a prior dangerous condition does not necessarily establish his actual awareness at the time of his collision. He may have forgotten about the hazard or have believed it eliminated. In any case, we see nothing unreasonable in the district court's finding that on the date of the accident Grace and S & M Towboat were unaware of the dangerous condition. Todd therefore had a duty to remove the danger or give notice of it, and this duty it breached.

## II. *The Vessel's Lack of Negligence*

The district court found that Grace, S & M Towboat, and all their employees, were not negligent in any respect. We see no clear error in this finding.

Todd contends that the rule in admiralty is that when a moving vessel strikes a fixed structure the vessel is at fault unless the moving vessel can exonerate herself by proving that the collision was caused by uncontrollable forces, and cites The Virginia Ehrman and The Agnese, 97 U.S. 309, 315, 24 L.Ed. 890 (1877), and other cases. We question whether the burden of proof rests on the vessel even when, as here, the fixed structure lies hidden below the water. But assuming that the vessel had the burden in this case, we believe the district court could reasonably find that the burden was carried.

Three theories might be argued to demonstrate the vessel's negligence. (A) It might be argued that the vessel was carelessly maneuvered into the drydock. (B) It might be argued that the vessel should have stayed entirely away from a drydock known to be hazardous. (C) Or it might be argued that even if those in control of the vessel did not know of the hazard, they *should* have. (Above we observed that the vessel's actual awareness of the hazard was required to obviate Todd's duty to remove the hazard or give notice of it; but granting that Todd had a duty in the absence of *actual* awareness, the vessel also may have been negligent if it *should* have had awareness.)

(A) The evidence showed that the drydock's entry was narrow, and that the breeze and the tidal current pushed against the side of the vessel. It may have been virtually impossible to avoid the collision under the circumstances.

(B) Of course, the vessel could have stayed away from the drydock altogether if the dangerous condition was known, but the court reasonably found that it was not. (C) And the court did not err in failing to hold the pilot negligent for not knowing of the condition despite the prior collision.

The pilot may reasonably have forgotten about the danger or believed it eliminated.

### III. *Prejudgment Interest*

The district court declined to award Grace prejudgment interest on the damages it sustained, but we find no abuse of discretion.

In admiralty, prejudgment interest must be granted unless peculiar circumstances justify its denial. *President Madison* (9 Cir. 1937) 91 F.2d 835. Whether or not the circumstances are sufficient to justify the denial is left to the discretion of the court. *President Madison, supra;* 3 Benedict, On Admiralty 191 (6th ed. 1940).

In this case, the circumstances clearly justify the district court's determination. Prior to trial, Grace had stipulated that the "damages of the respective parties to be entered in the event of the judgment for such party shall be . . . [f]or Grace against Todd, the sum of $17,265.03 . . . ." The court awarded Grace this amount in damages, without interest. It is not absolutely clear from the stipulation whether the parties agreed that no interest should be added to the stipulated amount, but the court, in its discretion, could reasonably so hold.

### IV. *The "Himalaya" Clause and COGSA*

The district court held that Todd was entitled to the same exemptions and immunities from and limitations of liability which Grace had against the cargo insurers.[1] We disagree, holding that Todd was entitled to some but not all, of the exemptions and immunities and limitations which Grace had, as detailed below.

---

1. The district court similarly held that S & M Towboat was entitled to these defenses, but since S & M Towboat was found not negligent to the cargo, we are concerned only with these defenses as they apply to Todd.

## A. *The Provisions of the "Himalaya" Clause*

The bills of lading constituting the contract of carriage between Grace and the cargo interests contain a so-called "Himalaya" clause, which reads in pertinent part as follows:

"The Carrier shall be discharged from all liability in respect of loss, damage and every claim whatsoever with respect to the goods unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered . . . . [I]t is expressly agreed between the parties [the Carrier and the cargo owners] hereto that the master, officers, crew members, *contractors,* stevedores, longshoremen, agents, representatives, employees *or others used, engaged or employed by the carrier in the performance of such work or services [undertaken in this contract], shall each be the beneficiaries of and shall be entitled to the same, but no further exemptions and immunities from and limitations of liability which the carrier has under this bill of lading,* whether printed, written, stamped thereon or incorporated by reference. . . . Without limitation or restriction of the exemptions and immunities from and limitations of liability provided for [above], *the persons and companies mentioned therein shall be entitled to the same, but no further, benefits which the carrier has under the U.S. Carriage of Goods by Sea Act, including but not limited to Sections 3(6), 4(1), 4(2) (a), 4(2)(q)' and 4(5) of said Act."* (Emphasis added)

■ As will be further discussed below, the United States Carriage of Goods by Sea Act (hereafter COGSA), 49 Stat. 1207 (1936), 46 U.S.C. §§ 1300–1315, grants certain immunities, exemptions, and limitations to carriers of cargo by sea. Although the Act does not itself extend these protections to non-carriers, the bills of lading purport to incorporate certain of COGSA's provisions into the contract and thereby protect certain non-carriers as well. As we discuss below, Todd was a contractor engaged in the performance of work undertaken in the bills of lading, and hence the following of COGSA's protections are purportedly extended to Todd *contractually:*

The one-year period of limitations for instituting suit and a notice-of-damage requirement [*see* COGSA, § 3(6), 46 U.S.C. § 1303(6)[2]];

The immunity from liability for unseaworthiness of the vessel unless caused by want of due diligence [*see*

2. COGSA, § 3(6), 46 U.S.C. § 1303(6), provides:

"Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of the delivery.

"Said notice of loss or damage may be endorsed upon the receipt for the goods given by the person taking delivery thereof.

"The notice in writing need not be given if the state of the goods has at the time of their receipt been the subject of joint survey or inspection.

"In any event the carrier and the ship shall be discharged from all liability in respect to loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered: *Provided,* That if a notice of loss or damage, either apparent or concealed, is not given as provided for in this section, that fact shall not affect or prejudice the right of the shipper to bring suit within one year after the delivery of the goods or the date when the goods should have been delivered.

"In the case of any actual or apprehended loss or damage the carrier and the receiver shall give all reasonable facilities to each other for inspecting and tallying the goods."

COGSA, § 4(1), 46 U.S.C. § 1304 (1) [3];

The immunity from liability for negligent acts in the navigation or management of the ship [see COGSA, § 4(2)(a), 46 U.S.C. § 1304(2)(a) [4]];

The immunity from liability for damage caused by fire, unless caused by the actual fault or privity of the carrier [see COGSA, § 4(2)(b), 46 U.S.C. § 1304(2)(b) [5]];

The immunity from liability for damage arising from any cause without actual fault or privity [see COGSA, § 4(2)(q), 46 U.S.C. § 1304 (2)(q) [6]]; and

3. COGSA, § 4(1), 46 U.S.C. § 1304(1), provides:
"Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from the unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section."

4. COGSA, § 4(2)(a), 46 U.S.C. § 1304(2) (a), provides:
"Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship . . . ."

5. COGSA, § 4(2)(b), 46 U.S.C. § 1304(2) (b), provides:
"Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

Fire, unless caused by the actual fault or privity of the carrier . . . ."

6. COGSA, § 4(2)(q), 46 U.S.C. § 1304(2) (q), provides:
"Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

The limited liability of $500 per package or freight unit unless the nature and value of the goods have been declared by the shipper before shipment and inserted in the bill of lading [see COGSA, § 4(5), 46 U.S.C. § 1304(5) [7]].

The exemptions, immunities and limitations which are pertinent to the instant case are the complete exemption from liability [see COGSA, § 4(2)(a), 46 U.S.C. § 1304(2)(a)]; the $500 limitation on liability [see COGSA, § 4(5), 46 U.S.C. § 1304(5)]; and the one-year period of limitations for instituting suit [see COGSA, § 3(6), 46 U.S.C. § 1303(6)].

Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage."

7. COGSA, § 4(5), 46 U.S.C. § 1304(5), provides:
"Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.
"By agreement between the carrier, master, or agent of the carrier, and the shipper another maximum amount than that mention in this paragraph may be fixed: Provided, That such maximum shall not be less than the figure above named. In no event shall the carrier be liable for more than the amount of damage actually sustained.
"Neither the carrier nor the ship shall be responsible in any event for loss or damage to or in connection with the transportation of the goods if the nature or value thereof has been knowingly and fraudulently misstated by the shipper in the bill of lading."

## B. The $500 Limitation on Amount of Liability

In Tessler Brothers (B.C.) Ltd. v. Italpacific Line and Matson Terminals, Inc. (9 Cir. 1974) 494 F.2d 438, this court squarely faced the issue of whether a "Himalaya" clause was valid which purported clearly and expressly to extend to a non-carrier the $500 limitation on liability which COGSA, § 4(5), 46 U.S.C. § 1304(5), provides for carriers. That clause was held valid, and *Tessler Brothers* is binding authority as regards the inclusion in bills of lading of *limitations on amount* of non-carrier's liability.

## C. The Complete Immunity from Liability for Negligence in Navigation and Management

1. *The historic background of COGSA.* In order adequately to understand the nature of the immunity under COGSA, § 4(2)(a), 46 U.S.C. § 1304(2)(a), one should keep in mind the history [8] of the Act and of its predecessor, the Harter Act, 27 Stat. 445 (1893), 46 U.S.C. §§ 190–196.

These two acts, especially COGSA, are by far the most important bodies of law for dealing with the question of who bears the loss when cargo is damaged in ocean commerce. Prior to their enactment, the general law of maritime carriage made the public carrier of goods by sea absolutely responsible for their safe arrival unless loss or damage was caused by Act of God or of the public enemy, or by the inherent vice of the goods or the fault of the shipper. Thus the carrier's liability was determined without regard to his negligence or lack of it. The carrier was therefore subject to stringent liability before the matter was regulated by statute.

Even before Congress came to their aid, carriers strove to diminish their liability under the general maritime law by inserting in the bills of lading various "exceptions" to liability. During the nineteenth century, the aggregate of such clauses, including the common law exceptions (such as Act of God, public enemy, and so forth), was large and more or less standardized.

But courts construed these exceptions narrowly when either of the two fundamental obligations of the carrier—to exercise due care with respect to cargo and to furnish a seaworthy ship—was apparently eliminated in the bills of lading. These obligations were held to remain unless clearly and expressly eliminated.

Draftsmen of the bills of lading began after a time to stipulate that the carrier was not to be held liable even for his own negligence or the negligence of the ship's people. British courts generally upheld these negligence exceptions, *see* In re Missouri S. S. Co., 42 Ch.D. 321 (1889), while United States federal courts usually held them void as against public policy, *see* Liverpool & Great Western Co. v. Phenix Ins. Co., 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788 (1889).

Apparently the courts in this country were unable to manipulate the principles of the common law in a way that would establish the desired delicate compromise between the interest of carriers, who sought full immunity from liability for all kinds of negligence, and the interest of cargo shippers, who sought to hold the carriers responsible for every sort of negligence.

This problem was dealt with by Congress in the Harter Act of 1893, *supra*. The statute, recognizing the common law obligations of the carrier to prove a seaworthy vessel and to exercise due care with respect to cargo, made it unlawful for a bill of lading to diminish these obligations. Thus shippers got some protection against the negligence of the carriers. On the other hand, the statute

---

8. In our historical account of COGSA, we have borrowed extensively from Gilmore and Black, The Law of Admiralty, pp. 119–129 (1957), both in content and in language. Because of the absence of quotation marks and citations in our account, we would like to make note of our indebtedness to this source.

provided that a carrier who has used due diligence to provide a seaworthy vessel should not be liable for damage or loss resulting from faults or errors in navigation or in the management of the vessel.

The net position of the Harter Act was this: the carrier could not contract out of the duty to use care to put his vessel in seaworthy condition or to use care with respect to cargo, but once he had fulfilled these duties, he could not be held liable for the negligence of those who navigated and managed the vessel. [It will be noted that negligent management of the vessel, from which the statute exonerates the carrier, could simultaneously constitute lack of care with respect to cargo, for which the statute holds the carrier liable; this apparent contradiction, the subject of many law suits, is relevant to this case and will be discussed below.]

The compromise of the Harter Act was so well received that it was embodied in main outline by a worldwide conference of maritime nations proposing the "Hague Rules" as a universal guide to treatment of the shipper-carrier relation. In 1936, in order to update the Harter Act to conform more closely with the world conference proposals, the Congress passed COGSA. The Harter Act was thus largely supplanted by COGSA, and the former, although it still retains some importance, is not relevant to the instant suit other than in its case law interpreting provisions now also included in COGSA.

2. *The relation between bills of lading and COGSA.* Section 3(1) of COGSA, 46 U.S.C. § 1303(1), and section 3(2), 46 U.S.C. § 1303(2), set forth broadly the affirmative grounds upon which a shipper may recover from the *carrier*; and sections 4(1), 46 U.S.C. § 1304(1), and 4(2), 46 U.S.C. § 1304(2), set out the specific exceptions from liability enjoyed by the *carrier*. The enacting clause in COGSA, 46 U.S.C. § 1300,[9] provides that every bill of lading shall have effect subject to the provisions of the Act; hence a bill of lading is read as if COGSA were incorporated by reference.

It will be noted that COGSA's provisions regulate the liability of carriers, *but not non-carriers.* Since the Act, in balance, is more protective than the common law, it is not surprising that non-carriers have nonetheless sought to place themselves under COGSA's shelter. This has been attempted by arguing in the courts that COGSA should be construed to protect parties other than carriers, despite the Act's language to the contrary; and since this argument has failed, the extension of COGSA has been attempted contractually, by providing in bills of lading that certain non-carriers would be subject to COGSA's protections.

In Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), the Supreme Court considered whether the provisions of COGSA should apply to a stevedore, either by virtue of the Act itself or by contractual extension in the bills of lading.

The Court held that nothing in the language, history, or environment of the Act showed a congressional intent to regulate by statute the liability of stevedores or other agents of the carrier.

The Court further noted that the bills of lading in that case did not *expressly* extend the provisions of COGSA to the stevedore.

In language of significance here, the Court stated as follows:

> "This Court has several times held that an agent's only shield from liability 'for conduct harmful to the plaintiff . . . is a constitutional rule of law that exonerates him.' . . .

9. COGSA, § 46 U.S.C. § 1300, provides:
   "Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this chapter."

[redacted]

*Any such rule of law, being in derogation of the common law, must be strictly construed,* for '[n]o statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.' . . . *Similarly, contracts purporting to grant immunity from, or limitation of,* liability must be strictly construed and limited to intended beneficiaries, for they *'are not to be applied* to alter familiar rules visiting liability upon a tortfeasor for the consequences of his negligence, *unless the clarity of the language used expresses such to be the understanding of the contracting parties.'* " (at 304–305; citations omitted; emphasis supplied).

The above quotation from the *Herd* opinion is of special import here. It suggests that the sole reason the Court refused to allow the contractual extension of COGSA's protections to stevedores was that the bill of lading in that case was not clear and express in its intent to make this extension; the *Herd* opinion might be interpreted to mean that a bill of lading, if it *clearly and expressly* extends a COGSA exemption, immunity or limitation to a non-carrier who is an agent of the carrier, is a valid derogation of the common law and will be given effect.

Thus the Court of Appeals for the Ninth Circuit in *Tessler Brothers, supra,* held on the basis of *Herd* that a bill of lading, *if clear and express,* was effective to extend the $500 *limitation on the amount* of liability, as provided in COGSA, § 4(5), 46 U.S.C. § 1304(5), to stevedores.

Our concern, however, is not with the contractual extension of the Act's *limitation on amount* of liability, but rather with an extension to non-carriers of the complete *exemption* from negligence in navigation and management as provided in COGSA, § 4(2)(a), 46 U.S.C. § 1304(2)(a).

3. *Does the bill of lading clearly extend COGSA, § 4(2)(a), 46 U.S.C. § 1304(2)(a), to Todd?* The bills of lading in our case expressly extended COGSA, § 4(2)(a), 46 U.S.C. § 1304(2)(a), to the master, officers, crewmembers, contractors, stevedores, longshoremen, agents, representatives, employees or others used, engaged or employed by the carrier in the performance of such work or services undertaken in the bills of lading. Although drydock operators were not expressly listed as persons covered, Todd would seem to be a "contractor," as the district court so held.

[redacted] Less clear is whether Todd's services were part of the work or services undertaken in the bills of lading. The district court held that they were, and we are disposed to agree. The primary work undertaken in the bills of lading is the transporting of cargo. But implicit in the undertaking is the agreement to take reasonable steps to ensure the safety of the cargo in transport. Thus it is customary for cargo vessels to drydock in transit for routine inspections and repairs. The work performed by the drydock operator, although directly affecting the ship only, aids the carrier in safely transporting the cargo. We therefore hold that Todd was a contractor employed by Grace in performing the work undertaken in the bills of lading and hence was clearly intended by the parties thereto to be entitled to the immunities of COGSA, § 4(2)(a), 46 U.S.C. § 1304(2)(a).

4. *Was the "Himalaya" clause an adhesion contract unenforceable against the cargo insurers?* There is a general rule of contract law that when there is a gross disparity of bargaining power between two parties to a contract such that one party has no choice but to adhere to unfavorable and unfair terms, those terms will not be enforced against him unless he has given his understanding consent to be bound. See Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69 (1960). The cargo insurers contend that the bills of lading are contracts of adhesion, *see* Cabot Corp. v. S.

S. Mormacscan, (2 Cir. 1971) 441 F.2d 476, 478, and that since they gave no "understanding consent," they are not bound.

■ We recognize, as said in *Tessler Brothers, supra,* p. 445, "that the content of ocean bills of lading is for all practical purposes completely within the carrier's power, subject to the provisions of COGSA, and that contracts purporting to limit liability must be strictly construed." But we are not persuaded that we should refuse to enforce the bills of lading simply because they are in this respect contracts of adhesion. The cases refusing to enforce contracts because they were contracts of adhesion have generally involved special circumstances, such as a grossly unfair bargain foisted by a noncompetitive industry upon the ordinary consumer on a "take-it-or-leave-it" basis, with the terms often buried in fine print unlikely to be understood or even read by the consumer. *See, e. g., Henningsen, supra.* There is no binding authority for likewise refusing to enforce bills of lading. The shipper or insurer of cargo, while not equal in bargaining power to the carrier, is not in the position of the ordinary man facing an enormous, impersonal industry. Surely the cargo insurers were aware of the "Himalaya" clauses. As a group they perhaps could muster the bargaining power necessary to alter the terms in the bills of lading. Therefore, although we might find the bills of lading sufficiently adhesive to warrant a strict construction against the carrier and his agents, we are not moved by their adhesive character to interfere with the freedom of contract to the extent of refusing entirely to give effect to the "Himalaya" clause. *Cf. Tessler Brothers, supra, p.* 445.

5. *Does COGSA, § 6, 46 U.S.C. § 1306, prohibit the extension of the Act to non-carriers?* Section 6, 46 U.S.C. § 1306,[10] provides that a carrier and a shipper may enter into *any agreement in any terms* as to the liability of the carrier's agents for negligence in respect to cargo, but may do so *only if no bill of lading has been or shall be issued and the shipments are not ordinary commercial shipments made in the ordinary course of trade.* Since in our case there *is* a bill of lading and the shipment *is* in ordinary commerce, § 6, 46 U.S.C. § 1306, does not apply.

■ But the cargo interests argue that § 6, 46 U.S.C. § 1306, prohibits by implication any agreement to which the Section does not apply. This argument was presented in *Tessler Brothers, supra,* p. 444, and found wanting. Although § 6, 46 U.S.C. § 1306, describes certain situations, none of which is present here, in which *any* exculpatory agreement is permissible, we see no implication in the Section that in all other situations, such as ours, *no* exculpatory agreement is permissible.

■ 6. *Does an extension of COGSA, § 4(2)(a), 46 U.S.C. § 1304(2)(a),*

10. COGSA, § 6, 46 U.S.C. § 1306, provides:
"Notwithstanding the provisions of sections 1303 to 1305 of this title, a carrier, master or agent of the carrier, and a shipper shall, in regard to any particular goods be at liberty to enter into any agreement in any terms as to the responsibility and liability of the carrier for such goods, and as to the rights and immunities of the carrier in respect of such goods, or his obligation as to seaworthiness (so far as the stipulation regarding seaworthiness is not contrary to public policy), or the care or diligence of his servants or agents in regard to the loading, handling, stowage, carriage, custody, care, and discharge of the goods carried by sea: *Provided,*

That in this case no bill of lading has been or shall be issued and that the terms agreed shall be embodied in a receipt which shall be a nonnegotiable document and shall be marked as such.
"Any agreement so entered into shall have full legal effect: *Provided,* That this section shall not apply to ordinary commercial shipments made in the ordinary course of trade but only to other shipments where the character or condition of the property to be carried or the circumstances, terms, and conditions under which the carriage is to be performed are such as reasonably to justify a special agreement."

*to non-carriers impermissibly derogate a common law principle against exculpation?* There is a controlling rule of the common law, stated in perhaps its clearest form in United States v. Atlantic Mutual Insurance Co., 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907 (1952), that "without congressional authority [carriers] cannot stipulate against their own negligence or that of their agents or servants." *Atlantic Mutual, supra,* at p. 242.

In COGSA, § 4(2)(a), 46 U.S.C. § 1304(2)(a), Congress has immunized *carriers* from liability for negligence in navigation or management. It has not, however, altered the common law rule as regards agents or servants. We must therefore inquire whether Todd was an "agent" or "servant" of the carrier. We have already held Todd to be a "contractor" but that of course does not necessarily make Todd an "agent." Restatement (Second) of Agency § 14N, Comment b (1957). If Todd *is* an agent, we must further inquire whether cases such as *Herd* and *Tessler Brothers,* both decided after *Atlantic Mutual,* indicate a development in the common law such that it no longer forbids carriers from contractually exculpating their agents and servants from negligence.

"Agency" has been commonly defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1957). The agent is the one who is to act. Restatement, *supra.*

From the facts of this case it is apparent that Todd was the carrier's agent within the meaning of the above definition. There was an agreement between the two that Todd should act on the carrier's behalf in maintaining the vessel in a seaworthy condition. Upon taking control of the vessel, Todd assuredly had a fiduciary duty to exercise skill and care in its work. This work, of course, would be subject to the ultimate control of the carrier as owner of the vessel.

As an "agent," Todd could not contractually be exculpated from its negligence, unless case law has modified the old common law rule. We do not think it has. *Herd* stands for the proposition that clear and express language in the contract is the *sine qua non* for altering the common law; but when that requirement is met, it is still left open for the courts to decide whether a particular alteration is repugnant to public policy. *Herd* did *not* imply that a contract, if clear and express in its intent, would be adequate to alter any familiar rule of tort liability whatsoever.

It is the holding of this court that a contract, no matter how clear and express, which purports *wholly to immunize a non-carrier* from liability for its negligence, is repugnant to traditional law and to sound policy. *Tessler Brothers,* which upheld the contractual *monetary limitation* of a non-carrier's (stevedore's) liability, is not inconsistent with our holding here, for as said in that case (at p. 443), "This distinction between a limitation on liability and an exemption from liability is crucial. A limitation, unlike an exemption, does not induce negligence."

*Tessler Brothers,* while stating that *Atlantic Mutual* was inapposite to a discussion of a "Himalaya" clause that merely limits the amount of recovery for negligence, recognized that *Atlantic Mutual* "[invalidates] clauses that *exempt* carriers or their agents from liability for their negligence." (p. 443; emphasis in original). This language, of course, was not essential to the holding in *Tessler Brothers* and is therefore dictum; yet we believe it accurately states the law of *Atlantic Mutual.* Since the "Himalaya" clause in this case purports to exempt non-carriers completely from any liability for negligence, and thereby strongly tends to induce negligence, the bill of lading is to that extent void.

7. *Assuming that COGSA, § 4(2)(a), 46 U.S.C. § 1304(2)(a), could validly be extended to Todd, does the language of that provision apply to Todd's conduct?* There is an alternate ground for holding

that Todd is not immunized from liability—even if § 4(2)(a), 46 U.S.C. § 1304(2)(a), could validly be extended to protect non-carriers, its protection does not cover the sort of negligence of which Todd was culpable.

for "Act, neglect, or default . . . in the navigation or in the management of the ship . . . ." A reading of the many cases giving content to the words "navigation" and "management" makes it evident that Todd was doing something else.

None of the cases actually gives a precise definition of the words, for the courts, eschewing abstractions, have been satisfied with determining on a case-to-case basis whether a particular act was or was not in "navigation" or "management." Most of the cases have involved drawing the line between negligence in care of the cargo, for which there is liability, and negligence in navigation or management of the vessel, for which no liability attaches.[11] Obviously, carelessness in navigating or managing a cargo-laden ship would simultaneously create a foreseeable danger to the cargo; hence, it is not easy to draw a distinct line. Yet read as a whole, the cases would seem to support this test: If the act in question has the primary purpose of affecting the ship, it is "in navigation or in management"; but if the primary purpose is to affect the cargo, it is *not* "in navigation or in management."

This test can be applied to our case by rough analogy only, for Todd's negligence—a failure to maintain a safe drydock—was in omission, not commission, and hence had no primary purpose. But the omission-commission distinction presents no difficulty if we assume hypothetically that Todd, instead of omitting to make the drydock safe, had undertaken to repair it, and had performed the job negligently. If Todd had thereby caused damage to a ship that later used the facilities, then we would hold

11. We take some examples cited in Gilmore and Black, The Law of Admiralty, p. 137 (1957):

"The following have been held errors in 'navigation' or 'management': Failure to remove water from bilges, resulting in moistening and spoilage of hides, The Merida, 107 F. 146 (2d Cir. 1901); change of course and failure to put in for repairs, Corsair [Corsar] v. J. D. Spreckels & Bros. Co., 141 F. 260 (9th Cir. 1905); leaving port in disregard of weather warning, Hanson v. Haywood Bros. & Wakefield Co., 152 F. 401 (7th Cir. 1907); tipping ship to examine propeller, The Indrani, 177 F. 914 (2d Cir. 1910); washing down of leaking sulfuric acid drums with water, increasing corrosive power of acid and damaging flour in hold below, The Milwaukee Bridge, 26 F.2d 327, 1928 A.M.C. 1063 (2d Cir. 1928), certiorari denied 278 U.S. 632, 49 S.Ct. 31, [73 L.Ed. 550] (1928); selecting an unsafe anchorage and failing to give signals of distress, Luria Bros. & Co. v. Eastern Transp. Co., 89 F.2d 900, 1937 A.M.C. 778 (2d Cir. 1937); failure to make frequent inspection of brass caps on sounding pipes, with result that water entered, The Newport News, 199 F. 968 (S.D.N.Y.1912). (Often, these are holdings in the alternative, the other possibility being that there is no negligence of any kind.)

"The following have been held errors in the duties owed to cargo: Use of an improper refrigerant, Barr v. International Mercantile Marine Co., 29 F.2d 26, 1929 A.M.C. 53 (2d Cir. 1928); so directing discharge from after hold as to bring about depression of bow and wetting of cargo there. The Joseph J. Hock, 70 F. 2d 259, 1934 A.M.C. 507 (2d Cir. 1934); stowage of leaky acetic acid drums near iron plates, Armco International Corp. v. Rederi A/B Disa, 151 F.2d 5, 1945 A.M. C. 1064 (2d Cir. 1945); failure to observe condition of thermometers in refrigerating compartments, The Samland, 7 F.2d 155, 1925 A.M.C. 1198 (S.D.N.Y.1925); failure to close lid of ventilator before running hose over it, Lockett Co. v. Cunard S. S. Co., 21 F.2d 191, 1927 A.M.C. 1057 (E.D. N.Y.1927); improper ventilation of hold, The Rita Sister, 69 F.Supp. 480, 1946 A. M.C. 910 (E.D.Pa.1946). For an example of the technical problems of stowage, see The Norte, 69 F.Supp. 881, 1947 A.M.C. 381 (E.D.Pa.1947)."

In addition, The Germanic, 196 U.S. 589, 25 S.Ct. 317, 49 L.Ed. 610 (1905), is a leading case finding negligence to cargo; there, the cargo was unloaded in a manner causing the vessel to list and sink.

that such act of negligence would have the primary purpose of affecting the drydock, not of affecting the ship.

 True, acts affecting the drydock would ultimately affect the ship, just as acts affecting a ship would indirectly affect the cargo inside, But we are not looking for ultimate and indirect effects when trying to determine whether an act is in navigation or management of the ship. What we are looking for is whether the act which is negligently done, or not done, is primarily directed at the ship itself, or at something else. It seems apparent that Todd's negligence was not primarily directed at the *Santa Ana*, for Todd had been negligent as regards the drydock long before the *Santa Ana* contracted to enter it. We therefore hold that Todd's negligent maintenance of the drydock was not "in navigation or management" of the vessel and that § 4(2)(a), 46 U.S.C. § 1304(2)(a), has no relevance to this case.

#### D. *The Time Limitation Under COGSA, § 3(6), 46 U.S.C. § 1303(6)*

*Tessler Brothers, supra,* p. 443, stated that *Atlantic Mutual* while invalidating clauses that completely exempt the agents of carriers, is inapposite to clauses that merely limit the amount of liability. In a similar vein, we believe that *Atlantic Mutual* is inapposite to clauses merely limiting the time limit in which suit must be brought. We might hold differently if the time limit provided were so short that it created an unreasonable risk to the plaintiff that he would lose his cause of action. But such is not the case. COGSA indicates the congressional determination that one year is a reasonable time limit for instituting suit against a carrier, and we see no factors necessitating more time for suit against the carrier's agents.

Since the extension of § 3(6), 46 U.S.C. § 1303(6), to agents of the carriers is clear and express, and since it creates a reasonable limitation on the common law liability of agents, and

since there is no binding authority for holding such clauses void, we uphold the validity of this portion of the bills of lading.

This necessarily moots the holding of the district court that Royal Globe's suit was barred by laches. Since Royal Globe commenced its suit well after the one-year limit of § 3(6), 46 U.S.C. § 1303(6), had passed, and was thus barred by that fixed period of limitations, there is no need to decide if laches provides an additional time-bar. We leave it for the district court to determine on remand whether any other plaintiffs are affected by § 3(6), 46 U.S.C. § 1303(6).

Affirmed in part, and reversed in part and remanded for further proceedings not inconsistent with this opinion.